# United States Court of Appeals
## For the First Circuit

No. 03-2410

UNITED STATES,

Appellee,

v.

JOHN MEADA, III,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Circuit Judge,
Leval,[*] Senior Circut Judge,
and Lipez, Circuit Judge.

Alison M. Adams, with whom The Chase Law Group and David R.
Yannetti were on brief, for appellant.
Donald L. Cabell, Assistant U.S. Attorney, with whom Michael
J. Sullivan, U.S. Attorney, was on brief, for appellee.

May 23, 2005

[*]Of the Second Circuit, sitting by designation.

**LIPEZ, Circuit Judge**.  John Meada was arrested and indicted on weapons possession charges after police discovered firearms and ammunition in his home during a warrantless search. Before trial, Meada moved to suppress all of the evidence that police had discovered in his apartment.  After several evidentiary hearings, the trial court granted Meada's motion with regard to grenades found in an ammunition can but ruled that other firearms and ammunition were admissible because they were either in a location Meada's girlfriend consented to be searched or were in a container in plain sight that betrayed its contents.  Meada entered a conditional guilty plea but preserved the right to challenge the suppression ruling on appeal, which he now does.  He also challenges his sentence.  We affirm the denial of Meada's motion to suppress but vacate his sentence in light of United States v. Booker, 125 S. Ct. 738 (2005), and remand for the limited purpose of resentencing.

**I.**

We take the following facts from the district court's findings, drawing on the record for additional facts as necessary. On January 2, 2002, Carol Bowering went to the Hanover, Massachusetts Police Department to inquire about obtaining a restraining order against John Meada, her boyfriend, who she claimed had recently been violent toward her.  Bowering sought to collect personal belongings that she brought to Meada's apartment

while living there with him since November 2001. A police officer instructed her to apply for a restraining order at the Hingham District Court, and she did so.

Bowering returned to the Hanover Police Department with her restraining order later that afternoon. She told the officer on duty, Stephen Moar, that she had lived with Meada for approximately two months and that she kept clothing and a cat at his apartment. Moar inquired for officer-safety purposes whether there were any weapons in the apartment. Bowering answered that Meada had two long guns and one handgun, specifying their locations in the apartment. Upon running a criminal history check on Meada, Moar discovered that he had a criminal record and did not have a license to carry a firearm. Moar and another officer, Gregg Nihan, then accompanied Bowering to Meada's apartment to collect her belongings.

Meada was not home when Bowering and the officers reached the apartment. Bowering led the officers into the two-family unit that Meada shared with his relative, Barbara Valentonis, and through the unlocked door to Meada's apartment. She indicated a BB gun and pellet rifle in plain view in the entryway and living room, and then pointed to a kitchen cabinet where she said Meada kept another gun. Upon opening the cabinet, Nihan found a .25 caliber wooden handled handgun, several boxes of ammunition, and what he and Moar recognized as an "ammunition can," a metal

container commonly used to store ammunition. Nihan opened the can without asking Bowering's permission to do so. He discovered two grenades inside.

Moar then accompanied Bowering into the bedroom where her personal belongings were stored. A case labeled "GUN GUARD" stood upright in the bedroom in plain view; it was fastened but not locked. Without asking Bowering for permission, Moar placed the case on the bed and opened it. He discovered three guns inside: one sawed-off shotgun, one .40 caliber handgun and one .32 caliber Winchester rifle. Meada returned home soon thereafter. Moar served him with the restraining order outside the apartment, placed him under arrest for weapons violations, and instructed him to wait in a police car while the officers finished their search and Bowering collected the rest of her possessions.

Meada was subsequently indicted on three weapons charges. Count One of the indictment charged him with being a felon in possession of firearms and ammunition, 18 U.S.C. § 922(g)(1). Counts Two and Three charged him with possession of an unregistered firearm, 26 U.S.C. § 5861(d), with Count Two based on the sawed-off shotgun, and Count Three based on the grenades.[1] In response, Meada moved to suppress all of the evidence seized from his

_____

[1]None of the charges involved the pellet rifle and BB gun discovered in the entryway and living room.

apartment, contending that the warrantless search violated his Fourth Amendment rights.

At a suppression hearing on February 28, 2003, the government presented several witnesses including Bowering, Moar, and Nihan. Bowering testified about her relationship with Meada and her activities on the day of the search. Moar and Nihan testified about the search itself, including the basis for their belief that Bowering lived in the apartment and had authority to consent to a search of it. First, Bowering appeared to be more than a casual visitor because she kept clothing and her cat at the apartment and because she asserted that she would be able to enter the apartment in Meada's absence (without a key). Moar also testified that he had driven by Meada's apartment numerous times between 4 p.m. and midnight during November and December 2001 because Meada was a suspect in an unrelated investigation, and that Bowering's red Firebird was regularly parked there. Meada then presented Valentonis, his sole witness. She testified that Bowering visited the apartment several times a week but that she had never seen Bowering there without Meada.

Following the testimony, the court denied Meada's motion with regard to the handgun and ammunition discovered in the kitchen cabinet, finding that the officers reasonably believed Bowering had authority to consent, and that she had actual authority to consent, to a search of the apartment that included the cabinet. The court

reserved judgment on items found in the ammunition can and gun case, allowing additional briefing on the admissibility of items seized from closed containers.

On June 19, 2003, the court held another hearing at which Meada and his friend Daniel Marshalsea testified pursuant to a Motion to Reopen. Meada claimed that Bowering had never lived with him, that he always locked his apartment door but that the lock had been jimmied open on the day of the search, that the weapons were not his but rather belonged to another man who had briefly stayed in his apartment, and that he did not store the guns or the GUN GUARD case in plain sight. Marshalsea testified that Bowering had come to Meada's apartment only once or twice a week and that her relationship with Meada was not sexual. The court rejected both Meada and Marshalsea's testimony, which conflicted with that offered by Bowering, the police, and even Meada's own witness, Valentonis, and found that Meada had "taken this occasion to commit perjury." The court then repeated its earlier ruling that the handgun and ammunition discovered in the kitchen cabinet were admissible.

At a third hearing on June 24, 2003, the court granted in part and denied in part Meada's motion to suppress the weapons found in the ammunition can and the gun case; that ruling was reflected in a written order issued on August 29, 2003. Distinguishing between the areas of the apartment to which Bowering

had access, and these containers, to which she did not, the court noted that "[c]onsent to search a dwelling is not necessarily coterminous with consent to search closed containers within it." Nonetheless, the court concluded that the firearms found in the gun case were admissible. It reasoned that "the GUN GUARD case constructively constituted at least one gun in plain view in the bedroom" because the label betrayed the container's contents. Meada thus had no reasonable expectation of privacy in the case and could not challenge that aspect of the search.

By contrast, the court concluded that Meada did have a privacy expectation in the ammunition can because its outward appearance did not reveal that it contained grenades. The court found that Bowering did not consent to a search of the can, nor could the police reasonably have believed she had authority to consent to such a search in light of her initial indication that she did not own any of the weapons in the apartment. Because the court also found that the inevitable discovery doctrine did not apply, it granted Meada's motion to suppress the grenades.[2]

Following the court's evidentiary rulings, Meada entered a conditional guilty plea to Counts One and Two of the indictment. Count Three of the indictment, involving the grenades, was dismissed. The court then sentenced Meada to 108 months'

---

[2]The government has not appealed from the suppression of the grenade evidence.

imprisonment. This sentence reflected a guidelines calculation that included a two-level enhancement for obstruction of justice, U.S.S.G. § 3C1.1 (2002), because of the court's finding that Meada committed perjury at the June 2003 suppression hearing. The court rejected Meada's argument that a reduction for acceptance of responsibility was appropriate under U.S.S.G. § 3E1.1 (2002), concluding that in light of Meada's ongoing insistence that the weapons found in the apartment were not his, "[t]his is not a case where Mr. Meada attempted to obstruct justice and has reformed. This is a case in which he's continuing the misconduct that caused me to find in June that he had committed perjury."

Meada now appeals, exercising the right he preserved below to challenge the court's evidentiary rulings. First, he argues that Bowering did not have actual authority to consent to a search of the apartment, nor was it reasonable for the police to believe that she had such authority. He further asserts that the court should have suppressed the three firearms found in the gun case for the same reasons that it suppressed the grenades discovered in the ammunition can. Meada also appeals his sentence, challenging both the two-level obstruction of justice enhancement and the court's refusal to adjust the sentence downward for acceptance of responsibility. Finally, he contends that he is entitled to be resentenced in light of United States v. Booker, 125 S. Ct. 738 (2005).

## A. The Fourth Amendment

"This court reviews a district court's legal conclusions involved in denying a motion to suppress the evidence de novo and its findings of fact for clear error." United States v. Marshall, 348 F.3d 281, 284 (1st Cir. 2003). Our deferential review of the court's factual findings "'reflects our awareness that the trial judge, who hears the testimony, observes the witnesses' demeanor and evaluates the facts first hand, sits in the best position to determine what actually happened.'" United States v. Charles, 213 F.3d 10, 18 (1st Cir. 2000) (quoting United States v. Young, 105 F.3d 1, 5 (1st Cir. 1997)).

The Fourth Amendment generally requires the police to obtain a warrant before entering and searching a person's home. See United States v. Beaudoin, 362 F.3d 60, 65 (1st Cir. 2004), cert. denied, 125 S. Ct. 484 (2004) ("A warrantless search involving an intrusion into someone's home is presumptively unreasonable under the Fourth Amendment."). However, this rule is not absolute; the Supreme Court has recognized that warrantless searches do not offend the Fourth Amendment under certain circumstances. For example, police need not seek a warrant where "voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses

common authority over the premises."  Illinois v. Rodriguez, 497
U.S. 177, 181 (1990) (internal citations omitted).

1. Bowering's consent to search the apartment

The district court held that the search of Meada's
apartment was constitutional under the consent exception to the
Fourth Amendment's warrant requirement.  Specifically, the court
found that Bowering consented to the search and that she had
authority to do so by virtue of having lived with Meada for two
months.  Although Meada disputes whether any actual authority
Bowering had extended to admitting third parties to the apartment,
we need not address that question here.[3]  Rather, we affirm solely
on the alternate basis offered by the district court: "[e]ven if
Bowering did not actually have the authority to consent to the
search, . . .  it was objectively reasonable for the law
enforcement officials to believe that she did."  This apparent
authority rationale is sufficient to immunize the search from
constitutional attack regardless of whether Bowering had actual
authority to consent.  Rodriguez, 497 U.S. at 186 ("The
Constitution is no more violated when officers enter without a
warrant because they reasonably (though erroneously) believe that
the person who has consented to their entry is a resident of the

---

[3]Meada also contests the district court's finding that
Bowering consented to the search.  Given Bowering's undisputed
testimony at the suppression hearing that she voluntarily led the
officers into the apartment and pointed the weapons out to them,
this challenge must fail.

premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.").

As the Supreme Court has explained, "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." United States v. Matlock, 415 U.S. 164, 170 (1974). Common authority rests "on mutual use of the property by persons generally having joint access or control for most purposes . . . ." Id. at 171 n.7. Even if a person does not in fact have such authority, police may rely on her consent if they reasonably believe that she has such authority. The Court set forth the standard for this reasonable belief in Illinois v. Rodriguez:

> [L]aw enforcement officers may [not] always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?

497 U.S. at 188 (quoting Terry v. Ohio, 392 U.S. 1, 21-22 (1968) (internal quotation marks omitted)).

Here, the district court pointed to numerous circumstances supporting a reasonable belief by the officers that Bowering had joint access to the apartment such that she could

-11-

consent to a search. Bowering told the officers that she kept personal possessions, including several changes of clothing, a photograph of her daughter, and her cat, at the apartment. She asserted that she could enter the apartment in Meada's absence. Her claim to have lived with Meada was also consistent with Moar's independent knowledge that her car had been parked in front of the apartment several evenings a week during the relevant time frame. Thus, the officers were not merely acting on an unsubstantiated assertion that Bowering had joint access to the apartment, but rather on the totality of the circumstances that supported such an assertion.

Meada contends that, to the contrary, the circumstances did not support the officer's belief that Bowering had common authority over the apartment. He analogizes this case to Rodriguez, in which the Supreme Court found that a woman who had previously lived with the defendant but later moved out did not have the authority to consent to a search of his apartment. 497 U.S. at 181-82. There, the Court noted that Gail Fischer, the consenting party, no longer lived in the apartment at the time of the search, that her name was not on the lease, and that she did not pay rent. Although Fischer had a key to the apartment, she had obtained it without the defendant's permission. Meada stresses that Bowering, like Fischer, had another residence and had not been given a key by the apartment owner.

-12-

In rejecting Meada's argument, we note that Rodriguez's factual inquiry was limited to the issue of actual authority. The lower court in Rodriguez did not reach the question of whether the officers had an objectively reasonable belief that the person granting access to the premises had authority over those premises because it erroneously ruled that, as a matter of law, "reasonable belief could not validate entry." 497 U.S. at 189. The Supreme Court remanded so that the lower court could determine whether the officers had such a reasonable belief. Id. Because we affirm the district court's denial of the suppression motion on the grounds that, in the officers' perception, Bowering had apparent authority to invite them into the apartment, it makes no difference whether in fact she possessed any more legitimate claim of authority than Fischer in the Rodriguez case. What matters is whether, based on the information in the officers' possession, they reasonably believed that Bowering had authority to invite them into the apartment.

Focusing on Bowering's authority as it appeared to the officers, Meada contends that because they knew she was seeking a restraining order against Meada and intended to move out, the officers could not have reasonably believed she still had authority to invite them into the apartment. We disagree. So far as the officers knew, Bowering had not told Meada of the restraining order. She told them she had been living at the apartment for two

-13-

months and still had her personal belongings including her cat there. Under the totality of the circumstances, it was objectively reasonable for the police to believe that Bowering retained "mutual use of the property" and thus could consent to a search. Matlock, 415 U.S. at 171 n.7; see also United States v. Trzaska, 859 F.2d 1118, 1120 (2d Cir. 1988) (estranged wife had authority to consent to a search of her former husband's apartment two weeks after she moved out, where she still had a key and collected personal belongings during the search).

### 2. The GUN GUARD case

The district court also denied Meada's motion to suppress the contents of the gun case found in his bedroom. The court found that Meada did not have a reasonable expectation of privacy in the contents of the gun case because the case's GUN GUARD label "clearly revealed its contents. It was specifically made to carry guns and was stamped accordingly." Thus, because the gun case was in plain view in the bedroom, which the police entered with Bowering's consent, the court treated the firearms inside the case as if they were also in plain view. Meada contends that this finding was erroneous. We agree with the district court.

The district court recognized that Bowering's consent to search the apartment did not necessarily authorize the officers to search closed containers within the apartment. See United States v. Karo, 468 U.S. 705, 725 (1984) (O'Connor, J., concurring)

-14-

("Consent to search a container or a place is effective only when given by one with 'common authority over or other sufficient relationship to the premises or effects sought to be inspected.'") (quoting Matlock, 415 U.S. at 171). Specifically, because Bowering had disclaimed any ownership interest in the weapons in the apartment, the court noted that she could not have consented to a search of any closed container that "suggested the presence of ammunition or firearms." The gun case, like the ammunition can, appears at first blush to fall into this closed container category. Upon closer inspection, however, the two are distinguishable.

Although a person generally has an expectation of privacy in items he places in a closed container, some containers so betray their contents as to abrogate any such expectation. See United States v. Huffhines, 967 F.2d 314, 319 (9th Cir. 1992). The contents of such containers are treated as being in plain view. United States v. Donnes, 947 F.2d 1430, 1437-38 (10th Cir. 1991). Even if Bowering did not have the authority to consent to a search of the gun case, then, the search did not violate Meada's Fourth Amendment rights if the GUN GUARD label caused the firearms inside to be in plain view of the officers. See Harris v. United States, 390 U.S. 234, 236 (1968) ("It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence.").

-15-

In Arkansas v. Sanders, 442 U.S. 753 (1979), the Supreme Court specifically cited a gun case as an example of a container in which the owner has no expectation of privacy:

> Not all containers and packages found by police during the course of a search will deserve the full protection of the Fourth Amendment. Thus, some containers (for example a kit of burglar tools or a gun case) by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance. Similarly, in some cases the contents of a package will be open to "plain view," thereby obviating the need for a warrant.

442 U.S. at 765 n.13. Although the Court later overruled Sanders, it did so on an unrelated ground involving an application of the warrant requirement's automobile exception. See California v. Acevedo, 500 U.S. 565, 569 (1991). Our sister circuits who have considered the question have concluded that "the plain view container exception to the warrant requirement of the [F]ourth [A]mendment remains valid." Donnes, 947 F.2d at 1437 (10th Cir.); accord United States v. Williams, 41 F.3d 192, 196-97 (4th Cir. 1994) (acknowledging the plain view exception); United States v. Knoll, 16 F.3d 1313, 1320-21 (2d Cir. 1994) (acknowledging the exception without citing either Acevedo or Sanders); Huffhines, 967 F.2d at 319 n.5 (9th Cir.) (Acevedo "does not alter the principle set forth in Sanders that there is no reasonable expectation of privacy in a container that discloses its contents"); United States v. Villarreal, 963 F.2d 770, 776 n.2 (5th Cir. 1992) ("the logic of the Sanders footnote has survived").

-16-

Here, the container at issue was readily identifiable as a gun case. Particularly in light of the GUN GUARD label, the container's contents were unambiguous. Cf. United States v. Bonitz, 826 F.2d 954, 956 (10th Cir. 1987) (Sanders exception did not apply to a hard plastic case that experts identified as a gun case but that the trial court thought "could equally be suspected of carrying a violin"). Under Sanders, then, Meada had no reasonable expectation of privacy in the container's contents and thus the police search of the case did not violate the Fourth Amendment.

Meada challenges this conclusion, arguing that the district court should have suppressed the gun case's contents for the same reason that it suppressed the grenades found in the ammunition can. The court reasoned that the ammunition can "could have been used to store something other than weapons or ammunition," citing a case in which a search revealed gold currency inside such a can. See United States v. Gianquitto, No. 96-1408, 1996 WL 383909 (1st Cir. July 10, 1996) (unpublished). The court also noted that the officer here had expected the can to contain ammunition when, in fact, it contained grenades. Therefore, the court found, the can "did not clearly reveal its contents." Meada argues that, similarly, the gun case could have held something other than guns.

We are not persuaded. If that possibility, in and of itself, were enough to escape the reach of the Sanders exception, the exception would have virtually no application. We need not rule

-17-

on the correctness of the district court's suppression of the grenades found in the ammunition can. What justified the search of the gun case was that it reasonably appeared to contain a gun and that, as a convicted felon, Meada was prohibited from possessing one. Given that reasonable appearance, the fact that, upon opening and careful inspection, the gun case might turn out to contain something other than a gun was irrelevant. Because the officer was lawfully on the premises and had within his sight an object that reasonably appeared to be an item of contraband, he was authorized to seize it.[4]

## B. Guidelines calculation

At his sentencing hearing, Meada challenged the court's imposition of an obstruction of justice enhancement and its refusal to grant a downward departure for acceptance of responsibility. He renews these objections on appeal. We review the district court's interpretation of the sentencing guidelines de novo and the factual findings underlying the sentence for clear error. United States v.

---

[4] Meada also argues that the weapons in the gun case, like the grenades in the ammunition can, should be suppressed because they were not subject to inevitable discovery and the officers did not obtain a search warrant. The inevitable discovery doctrine permits the introduction of evidence obtained in an illegal search if such evidence would inevitably have been discovered through an independent legal search. United States v. Silvestri, 787 F.2d 736, 744-45 (1st Cir. 1986). In light of our conclusion that the gun case search was legal, we need not conduct an inevitable discovery analysis.

Caldwell, 358 F.3d 138, 142 (1st Cir. 2004). Meada has not demonstrated that his sentence was erroneous under this test.

1. Obstruction of justice

An obstruction of justice sentencing enhancement is appropriate where the district court finds that "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." U.S.S.G. § 3C1.1 (2002). Here, the district court imposed an obstruction of justice enhancement because it was "firmly convinced" that Meada committed perjury when he testified at the June suppression hearing. See id. cmt. n.4(b) (identifying perjury as conduct to which the enhancement applies). The court cited two specific subjects on which it believed Meada had given false testimony: his repeated insistence that Bowering did not live with him and his claim that he did not own any of the weapons in the apartment. The court concluded that "Mr. Meada knowingly made false statements which were material, and he did that in an effort to defeat or to advance his motion to suppress."

Meada asserts that he did not commit perjury. He essentially argues that his testimony was not false because there is no evidence to establish either that Bowering lived at his apartment or that he did not own the weapons. We disagree. The court's conclusion that Meada willfully lied in his testimony about

-19-

Bowering was not clearly erroneous. His testimony conflicted with several other witnesses, including one of his own, who the court considered to be more credible. The court also did not clearly err in finding that Meada had lied about the weapons. As we have said:

> Even if the record, read generously to appellant, might conceivably support some less damning scenario -- and we do not suggest that it can -- we would not meddle. Our review is only for clear error -- and "where there is more than one plausible view of the circumstances, the sentencing court's choice among supportable alternatives cannot be clearly erroneous."

United States v. Tejada-Beltrán, 50 F.3d 105, 110 (1st Cir. 1995) (quoting United States v. Ruiz, 905 F.2d 499, 508 (1st Cir. 1990).

### 2. Acceptance of responsibility

Meada also argues that the district court erred in denying him a three-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. He acknowledges that "[c]onduct resulting in an enhancement under § 3C1.1 (Obstructing or Impeding the Administration of Justice) ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct." Id. cmt. n.4. However, he asserts that this is one of the "extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply." U.S.S.G. § 3E1.1.

The district court, presented with the same arguments now before us, was unpersuaded. Citing Meada's false testimony at the suppression hearing and his ongoing insistence that he did not own the weapons in his apartment, the court concluded that "[t]his is

-20-

not a case where Mr. Meada attempted to obstruct justice and has reformed. This is a case in which he's continuing the misconduct that caused me to find in June that he had committed perjury." See § 3E1.1 cmt. n.3 (although pleading guilty before trial is "significant evidence of acceptance of responsibility," that evidence "may be outweighed by conduct . . . inconsistent with such acceptance").

We agree that Meada has not demonstrated that this case is "extraordinary" enough to merit an adjustment for acceptance of responsibility despite his obstructive conduct, nor has he pointed to any factor that the district court failed to consider. Therefore, the district court's refusal to grant an adjustment under § 3E1.1 was proper.

## C. **Booker** sentencing claim

The district court sentenced Meada to 108 months in prison under the mandatory guidelines in accordance with then-prevailing law.[5] The Supreme Court's subsequent decision in Booker, applicable to all cases on direct review, rendered the guidelines advisory rather than mandatory. Meada now asserts that he should be resentenced in light of this development. Because Meada failed to preserve this claim by arguing in the district

---

[5]Meada had a total offense level of 30 and a Category II criminal history. His guidelines sentencing range was 108-135 months.

court that the guidelines were unconstitutional, our review is for plain error. See United States v. Antonakopoulos, 399 F.3d 68, 76 (1st Cir. 2005). Under the plain error standard, we may vacate a sentence imposed pursuant to the mandatory guidelines "where, either in the existing record or by plausible proffer, there is reasonable indication that the district judge might well have reached a different result under advisory guidelines." United States v. Heldeman, 402 F.3d 220, 224 (1st Cir. 2005).

There are such indications in this case. While we have little doubt that the district court, had it recognized the guidelines were advisory, would have found the pertinent sentencing facts much as it did, see Antonakopoulos, 399 F.3d at 80, the further question arises whether the court would have attached the same sentencing consequences to those facts. Under the dictates of the guidelines, Meada's perjury had a substantial impact on his sentence. It resulted in the addition of two levels for obstruction of justice. Furthermore, his subsequent failure to correct the perjury when given the opportunity to do so may well have caused the related denial of a three-level adjustment for acceptance of responsibility. The addition of five levels exposed Meada to an increased minimum sentencing range of nearly four years. While the district court made clear that for other reasons Meada should receive a "long" sentence, the court did not indicate that nine years, the lowest sentence permitted under his sentencing

range, was the appropriate sentence.  Taking all this into account, we think there is a reasonable probability that the district court would have sentenced Meada to less time if it had known that the guidelines were advisory, rather than compulsory.  We therefore vacate and remand for resentencing.  However, this remand "should not be taken as either a suggestion or a prediction that the sentence will necessarily be altered."  <u>Heldeman</u>, 402 F.3d at 224.

### III.

The denial of Meada's suppression motion is <u>affirmed</u>. Meada's <u>sentence</u> is <u>vacated</u> and <u>remanded</u> for further proceedings consistent with this opinion.

**<u>So ordered.</u>**