# United States Court of Appeals
## For the First Circuit

No. 18-1876

UNITED STATES OF AMERICA,

Appellee,

v.

BRYAN MORAN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Lynch, Selya, and Barron,
Circuit Judges.

Mary A. Davis, with whom Tisdale & Davis, P.A. was on brief,
for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom
Andrew E. Lelling, United States Attorney, was on brief, for
appellee.

November 27, 2019

**BARRON**, **Circuit Judge**.  Bryan Moran ("Moran") pleaded guilty on May 9, 2018 to possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1), in the United States District Court for the District of Massachusetts.  He reserved his right to challenge, on appeal, the denial of his motion for reconsideration of the denial of his motion to suppress certain evidence -- specifically, fentanyl obtained from within closed black garbage bags that were found in his sister's storage unit during a warrantless search.  He now contends that his conviction must be vacated because the District Court erred in denying that motion for reconsideration.  The District Court based its ruling on the ground that a person with apparent authority to consent to that search -- namely, Moran's sister -- gave it, even if she did not have actual authority to do so.  Because we agree with Moran that the government failed to meet its burden to show that his sister had either actual or apparent authority to consent to that search, we reverse the denial of his motion for reconsideration, vacate his conviction, and remand the case.

## I.

Just over one week before the search in question, Moran stored several closed, opaque, black plastic garbage bags that contained some of his effects in a storage unit that belonged to

- 2 -

his sister, Alysha Moran ("Alysha").[1] A week later, after Moran was arrested and while he was being held at the Middlesex County Billerica House of Corrections on a separate charge, he learned that Alysha's storage unit needed to be emptied. He asked her -- on a recorded phone call -- to move his bags.

A detective from the police department for the Town of Wilmington, Massachusetts was informed of the call. That detective and officers from the police department for the Town of North Reading, Massachusetts then went to Alysha's apartment and obtained her oral consent to conduct a search of her apartment. At some point after she consented to the search of her apartment, Alysha signed a "Consent For Search" form that the law enforcement personnel conducting the search had provided to her. This form authorized law enforcement authorities to "conduct a search of [her] premises/vehicle" -- specifically, of her apartment, her car, and her storage unit -- and "to take possession of any items found which are relevant to the police investigation." In signing the form, Alysha certified that she was consenting to the search "voluntarily, without threats of promises of any kind."

---

[1] The facts recited are either undisputed or drawn from the District Court's initial Memorandum & Order denying Moran's motion to suppress. The District Court reconsidered the suppression motion and issued a subsequent Memorandum & Order, but the District Court did not modify its initial findings of fact.

Law enforcement authorities then searched Alysha's car and her storage unit. The District Court found that, when the authorities that conducted the search of Alysha's storage unit opened it, "Alysha differentiated the contents of the unit, stating the black bags belonged to Moran while the boxes containing Christmas decorations belonged to her." The District Court also found that "[a]lthough it is unclear whether Alysha gave express consent to search Moran's bags, it is undisputed that she did not limit her written consent or object to any portion of the search."

Before law enforcement authorities searched the contents of the storage unit, Alysha left the premises to pick up her child. The law enforcement authorities who conducted the search removed the closed garbage bags that are at issue from the storage unit. A police canine was brought to the scene to check for drugs and did not alert when it sniffed the bags. (The canine was not trained to detect fentanyl.) The authorities proceeded to open the bags and search their contents, and find fentanyl inside them. Alysha later stated in an interview with a detective from the Town of Wilmington and an agent from the United States Drug Enforcement Administration that she did not know the bags contained fentanyl.

Moran was indicted for possession with intent to distribute fentanyl, in violation of 21 U.S.C. § 841(a)(1). He filed a motion to suppress the fentanyl as the fruit of an illegal search of the bags. The District Court denied the motion to

suppress on the ground that, although Moran had a reasonable expectation of privacy in those bags, the law enforcement authorities did not need a warrant to search them because Alysha had actual authority to consent to their search and voluntarily had given such consent.

Moran filed a motion for reconsideration of the District Court's denial of the motion to suppress. In denying the motion for reconsideration, the District Court declined to reach the issue of whether Alysha had actual authority to consent to the search of the bags. The District Court found instead that Alysha had apparent authority to consent to their search. This appeal followed.

## II.

The Fourth Amendment of the federal Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "The Fourth Amendment generally requires that the government obtain a warrant based on probable cause before conducting a search." United States v. Hood, 920 F.3d 87, 90 (1st Cir. 2019) (citing Katz v. United States, 389 U.S. 347, 362 (1967) (Harlan, J., concurring)). The warrant requirement, however, is not absolute; "police need not seek a warrant where 'voluntary consent has been obtained, either from the individual whose property is searched, or from a third party

- 5 -

who possesses common authority over the [property].'" United States v. Meada, 408 F.3d 14, 20 (1st Cir. 2005) (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)).

The government does not dispute the District Court's finding that the bags at issue belonged to Moran. The government also recognizes that the District Court denied Moran's motion for reconsideration on the ground that Alysha had apparent authority to consent to the search of the black garbage bags and not on the ground on which it had initially relied in denying the motion to suppress -- namely, that Alysha had actual authority to give such consent. Nevertheless, we may affirm the District Court's ruling on any ground manifest in the record, see United States v. Rivera, 825 F.3d 59, 64 (1st Cir. 2016), and the government first asks us to do so on the ground that Alysha had actual authority to grant the necessary consent. We thus begin with the actual authority issue. After explaining why we cannot affirm on that basis, we then turn to the apparent authority issue. With respect to both issues, we review the District Court's legal conclusions de novo and its findings of fact for clear error. Meada, 408 F.3d at 20.[2]

_____

[2] Moran argues that, despite Alysha's authorization for the police to "take possession" of items relevant to the investigation and the District Court's finding that Alysha did not limit her written consent or verbally object during the search, Alysha's general consent to search the storage unit did not extend to his bag's stored therein. We assume, without deciding, that Alysha did consent to a search of Moran's bags and address only whether she had the actual or apparent authority to do so.

- 6 -

**A.**

A third party may consent to search another's effects if the third party "possesse[s] common authority over . . . [the] effects sought to be inspected." United States v. Matlock, 415 U.S. 164, 171 (1974). "Common authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'" Meada, 408 F.3d at 21 (quoting Matlock, 415 U.S. at 171 n.7). Such "mutual use" makes it "reasonable to recognize that [the third party] has the right to permit the inspection in [her] own right and that the other[] [party has] assumed the risk" that the third party will grant that permission. Matlock, 415 U.S. at 171 n.7.

---

Insofar as the government adequately develops the argument that Moran did not have a reasonable expectation of privacy in his closed, opaque black bags, see United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."), the argument lacks merit, see Meada, 408 F.3d at 23 (explaining that "a person generally has an expectation of privacy in items he places in a closed container"); compare United States v. Infante-Ruiz, 13 F.3d 498, 501-02 (1st Cir. 1994) (finding that the defendant had a reasonable expectation of privacy in a closed container that other people placed items within and that he left in the trunk of a rented car even when he was not a passenger), and United States v. Basinski, 226 F.3d 829, 836-38 (7th Cir. 2000) (finding that the defendant, who entrusted a briefcase to a lifelong friend and asked him to store and then destroy it, maintained a reasonable expectation of privacy in the briefcase), with United States v. Hershenow, 680 F.2d 847, 854-56 (1st Cir. 1982) (finding that a defendant relinquished his privacy interest in a closed container when he asked a business's maintenance employee to store a box in the business's barn, a place "unoriented to security," and did not inquire about the box during the four months that it was in the barn).

Thus, as we recently explained, to establish that the third party had the actual authority to consent to the search of effects that belong to another, the government must show that the third party had mutual use of those effects -- here the contents of the bags -- such that there is a "shared privacy interest" in them. United States v. Casey, 825 F.3d 1, 13-14 (1st Cir. 2016); see also Frazier v. Cupp, 394 U.S. 731, 740 (1969) (finding that a third party had actual authority to consent to the search of his cousin's duffel bag when the third party not only stored the bag, but was also a "joint user" of an interior compartment of the bag). The government bears the burden of making that showing. See Rodriguez, 497 U.S. at 181.

There is no evidence that, when Moran left his bags at Alysha's, he told her that she could open the bags and gain access to what was inside. And there is no evidence that one could see through the bags to the contents. In addition, the fact that Alysha had access to the bags at issue by virtue of their presence in her storage unit does not, on its own, establish her mutual use of whatever they contained. See United States v. James, 353 F.3d 606, 614 (8th Cir. 2003) (noting that "one does not cede dominion over an item to another just by putting [another] in possession"). And while the record does show that Moran had authorized Alysha to move the bags at issue without giving her explicit direction as to what she should do with them, that fact also fails to establish

that she had mutual use of the contents of those closed containers, notwithstanding that they were in her storage unit. See United States v. Basinski, 226 F.3d 829, 834 (7th Cir. 2000) (finding that a third party did not have authority to consent to a search of a briefcase when the defendant gave the third party the briefcase and asked him to destroy the case and its contents).

To fill in the gap in evidence that could show that Alysha had the requisite mutual use, the government relies on transcripts of recorded phone calls from November of 2015 that Moran made from the correctional facility in which he was then being held. The government argues that the law enforcement personnel who conducted the search knew the contents of those recorded calls and that those recordings reveal a pattern of Alysha going into Moran's closed containers -- including bags that belonged to him. The government then contends that, in light of the evidence demonstrating that pattern of behavior, it has met its burden to show that Alysha had mutual use of the garbage bags at issue, at least when that pattern is considered along with the other facts bearing on her potential mutual use of them that we have just reviewed. But, we do not agree.

The recordings came about when, in November of 2015, Moran was incarcerated on a different charge and had stored his possessions with his girlfriend, Tina Tomasi. According to the transcript of the first call from the correctional facility in

which he was being held, which occurred on November 5, 2015, Moran explained to Tomasi how to weigh and price orders for purchases -- presumably of drugs -- for two customers. On a second call from later that day between Moran and Alysha, on which the government also relies, the transcript shows that Moran asked his sister to "teach" Tomasi "how to do it." Alysha responded that she would "do it for her."

The third recorded phone call on which the government relies occurred on the same day from the same correctional facility. It was between Moran and Alysha. The transcript of the recording of that call shows that Moran told Alysha to "go get all [his] shit" and "all [his] money" from Tomasi. Moran further said, according to the transcript, "Alysha, I'm going to trust you as my sister, and to do things right, and fuckin keep things right, and that's that." He then told her that "people are going to be calling, and [she was] going to have to go see them." When she said during that call that she would keep the stuff in storage, he responded: "Yeah, but, then, what are you going to do? Go to the storage everyday [sic], every second you have to go get it? . . . [T]hey come like, like that, like three, four, five times a day . . . ."[3]

---

[3] The record also includes the transcript of a fourth phone call, made on November 8, 2015, in which Alysha told Moran that Tomasi had not brought all of Moran's possessions to Alysha.

Based on this third phone call, the District Court found that "[Moran] directed [Alysha] to access his property in order to supply contraband to two individuals."  But, the District Court made no finding that the direction that Moran gave Alysha at that time to access that property also encompassed the bags that Moran placed in Alysha's storage unit almost five months later, in March of the following year, and that are at issue here.  Nor did the District Court make any other finding based on the calls that would support the conclusion that Alysha enjoyed mutual use of the particular bags in question on this appeal.  Finally, neither the evidence of this third call nor of the other two -- nor, for that matter, any other evidence in the record -- makes manifest, either on their own or when considered together, that Alysha was an ongoing participant in Moran's drug business up through the time of the search of the bags that are at issue in this case.[4]

Thus, we do not see how either the evidence of the phone calls, or the District Court's finding as to what the third phone call established, supplies a basis for concluding that the government met its burden to show that Alysha had mutual use of the specific bags whose contents Moran seeks to suppress and thus that she had actual authority to consent to their search.  We

_____

[4] In fact, there is no evidence in the record that Alysha was involved in Moran's dealing at any point after that November call.

- 11 -

therefore reject the government's actual-authority-based argument for affirming the District Court's ruling.

**B.**

That the government cannot meet its burden to show that Alysha had actual authority to consent to the search of the closed black garbage bags found in her storage unit does not, however, end the matter. The government also asks us to affirm the District Court on the ground that Alysha had apparent authority to consent to the search of those items. We thus now turn to that issue.

To resolve the apparent authority issue, we must determine whether "the facts available to the officer[s] at the moment [of the search would] warrant a[n] [officer] of reasonable caution in the belief that the consenting party had authority" to consent, regardless of whether the consenting party actually did have such authority. Rodriguez, 497 U.S. at 188 (internal quotation marks and alteration omitted). We consider the facts available to law enforcement personnel at the time of the search to determine whether law enforcement "had a mistaken--but objectively reasonable--belief [that] the party in fact had the requisite authority to consent to the search." Casey, 825 F.3d at 14 (emphasis added). In this analysis, we consider whether a reasonable person would "act upon [the consent] without further inquiry." Id. (quoting Rodriguez, 497 U.S. at 188).

Once again, the government bears the relevant burden of proof.  See United States v. Davis, 332 F.3d 1163, 1169 (9th Cir. 2003) (citing Rodriguez, 497 U.S. at 181).  We find that law enforcement authorities' belief that Alysha had authority to consent was not objectively reasonable.

We held in United States v. Infante-Ruiz that an officer's determination that a driver's consent to search the rented car's trunk constituted consent to search the defendant's briefcase stored in the trunk was unreasonable.  13 F.3d 498, 504-05 (1st Cir. 1994).  We based that conclusion on the evident reasons to doubt that the scope of the driver's consent to the search of the trunk encompassed the defendant's closed container located inside the trunk.  Id. at 505.  We explained that the car driver's "general permission to search the car and its trunk was qualified by [the driver's] further statement to the officer, before the [officer] opened and searched the briefcase, that the briefcase belonged to [the defendant]."  Id.  We emphasized that, because of that statement regarding the ownership of the briefcase, "the scope of [the driver's] consent was ambiguous -- an ambiguity that could have been but was not clarified by further inquiry."  Id.

Like the putatively consenting party in Infante-Ruiz, Alysha made statements to the authorities who conducted the search that clarified that the closed containers that they wished to

search belonged to someone else. Yet, in the face of that statement from Alysha, the law enforcement authorities who were conducting the search, like the law enforcement personnel in Infante-Ruiz, made no further inquiry to clarify the nature of her consent. Thus, while the District Court determined that the showing of apparent authority had been made, we do not agree, given that the putatively consenting party claimed that the closed containers belonged to someone else and the degree of uncertainty that existed about whether she nonetheless enjoyed the kind of mutual use of them that would give her actual authority to consent to their search. See United States v. Peyton, 745 F.3d 546, 554 (D.C. Cir. 2014) ("[T]he government's burden to establish that a third party had authority to consent to a search . . . cannot be met if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry." (alteration in original) (quoting United States v. Whitfield, 939 F.2d 1071, 1075 (D.C. Cir. 1991))); United States v. Taylor, 600 F.3d 678, 683 (6th Cir. 2010) (finding that a third party lacked apparent authority and noting that the officers "never questioned [the third party] about whether she had mutual use or control of the [closed container]"); United States v. Purcell, 526 F.3d 953, 964 (6th Cir. 2008) (explaining that when officers face ambiguity about a third party's authority to consent, "either they may get a warrant, or they may simply ask the would-be-consenter whether he or she possesses the

- 14 -

authority to consent to the search of the other items that the officers wish to explore"); United States v. Kimoana, 383 F.3d 1215, 1222 (10th Cir. 2004) (explaining that "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent"); United States v. Salinas-Cano, 959 F.2d 861, 864 (10th Cir. 1992) (noting the relevance of "whether the consenter explicitly disclaimed ownership" in determining whether it was reasonable for the officers to believe that a third party had authority to consent to a search).

In arguing otherwise, the government relies again on the phone calls from November of 2015. But, just as the evidence of those calls does not establish a pattern of behavior between Alysha and Moran that could suffice to show that she had actual authority to consent to the search of whatever was inside of the bags at issue, the evidence of the calls also fails to provide a supportable basis on which law enforcement authorities could reasonably believe that Alysha had such authority. As we have noted, the calls from November were made nearly five months before the search at issue, and law enforcement authorities had no evidence that, after those calls, Alysha had anything to do with advancing her brother's drug dealing.

The government also relies on a number of precedents in support of its apparent authority argument, but they are each

- 15 -

readily distinguishable. In two of the cases on which the government relies, the consenting party did not state that the closed container at issue belonged to someone else, as Alysha did here. See United States v. Ruiz, 428 F.3d 877, 881-82 (9th Cir. 2005); United States v. Marshall, 348 F.3d 281, 288-89 (1st Cir. 2003). Thus, based on those circumstances, law enforcement reasonably could have believed, without further questioning, that the consenting party had mutual use and control of the container.

In the third case on which the government relies, the police reasonably believed that the third party had joint access to closed containers with narcotics inside in large part because the officers discovered a note that the third party wrote showing that she recently accessed the defendant's narcotics stash to assist with the defendant's drug dealing, and the third party proceeded to tell the officers which containers held drugs. See United States v. Penney, 576 F.3d 297, 309-10 (6th Cir. 2009). There is no comparable evidence of mutual use present here.

In the fourth, and final case on which the government relies, a truck driver was found to have had apparent authority to consent to the search of the truck trailer, despite the driver disclaiming ownership, because of a custom specific to the trucking industry. See United States v. Jenkins, 92 F.3d 430, 437-38 (6th Cir. 1996) (finding apparent authority because "[t]he generic relationship between the owner of a rig and its driver is

characterized by a considerable grant of authority to the driver," as the driver is "typically allowed to enter the trailer . . . [during] loading, unloading, [for] an inspection after an ominous noise, or [for] an emergency"). The government identifies no similar custom that could ground a finding of apparent authority in this case. Thus, that case, too, fails to support the government's position.

### III.

For the foregoing reasons, we **reverse** the denial of the motion for reconsideration, **vacate** the conviction, and **remand** the case to the District Court.