# United States Court of Appeals
## For the First Circuit

No. 13-1839

UNITED STATES,

Appellee,

v.

LASHAUN CASEY,

Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

Before

Thompson, Hawkins,* and Barron,
Circuit Judges.

Linda Backiel on brief for appellant.
Mariana E. Bauzá, with whom Rosa Emilia Rodríguez-Vélez,
United States Attorney, Nelson Pérez-Sosa, Assistant United States
Attorney, Chief, Appellate Division, Thomas Klumper, Assistant
United States Attorney, Senior Appellate Counsel, and Susan Z.
Jorgenson, Assistant United States Attorney, were on brief for
appellee.

---

* Of the Ninth Circuit, sitting by designation.

June 3, 2016

**HAWKINS**, <u>Circuit Judge</u>.   Lashaun Casey appeals his conviction by jury trial and life sentence for the death of an undercover police officer during a drug buy.   His appeal raises a host of challenges to rulings issued throughout his pretrial and trial proceedings, and urges he be granted a retrial.   For the reasons described in the opinion that follows, we affirm.

## I.   Background

### A.   Facts

The overarching series of events giving rise to this appeal are not in dispute.   Contested issues pertinent to Casey's arguments on appeal, and the appropriate standard of review for each, are addressed in the Discussion sections below.   While the record is brimming with numerous additional details, we keep our synopsis relevant to the questions we have been asked to consider.

In 2005, Puerto Rico Police Department ("PRPD") Agent Jesús Lizardi-Espada ("Lizardi") was assigned to investigate Casey undercover.   He eventually arranged with Casey's assistance to purchase four pounds of marijuana on the island of Culebra in the morning hours of August 1, 2005, from the drug supplier Alexander Hernández.   Lizardi and Casey were to drive to Fajardo, from where they would take a ferry to Culebra to meet Hernández.   A law enforcement team led by Lizardi's supervisor, Agent José Agosto-Rivera ("Agent Agosto"), traveled to Culebra by plane to await Lizardi and Casey's arrival.

When Agent Agosto did not see Lizardi and Casey arrive on the ferry as planned, a search for Lizardi commenced. Later that day, Agent Agosto found Casey at his workplace, a Holiday Inn in Isla Verde, and spotted Lizardi's gray Ford truck in the hotel parking lot. Upon leaving the Holiday Inn in Lizardi's truck, Casey was arrested and taken to PRPD general headquarters, where he was read his rights, signed a Miranda waiver, and began being questioned. Casey, who remained in PRPD custody until midday the following day, was moved to a PRPD precinct in Canóvanas and later to one in Luquillo. At some point, Casey told officers he was no longer interested in talking with the police.

While Casey was in PRPD custody, Casey's grandparents Mr. and Mrs. Rivera, with whom he lived, permitted law enforcement officers to search his bedroom without a warrant. In it, the FBI discovered a loaded firearm inside a jacket pocket, Lizardi's cell phone, and a pair of blood-stained flip flops. Casey was subsequently transferred from PRPD to FBI custody in Ceiba, where he was confronted with this evidence, and in the course of further questioning, requested an attorney. It was there that his common-law wife, Crystal Peña ("Peña"), came to visit him. Statements Casey made to her during their exchange were overheard by law enforcement, and later admitted as evidence against him.

Further investigation revealed that on the morning of August 1, 2005, Luis Algarín ("Algarín"), a cashier working at the

marina parking lot in Fajardo from which ferries to Culebra depart, witnessed a person he later identified in a photo array as Casey drive up to his booth in a gray truck, request to leave after losing his parking lot ticket, and pay with a twenty-dollar bill. Another parking lot employee, Peter Ávila-Natal, also observed on that same day in the lot a pick-up truck missing a driver's side window, and glass dust on the truck driver's elbow. The FBI recovered from the Fajardo parking lot a car window with what appeared to be a bullet hole in the middle, and a projectile which was later matched to the gun found in Casey's bedroom.

Law enforcement procured a warrant and searched Hernández's residence. A cadaver dog, trained to help locate decomposing bodies, gave alerting signals both inside and outside the residence. Officers questioned Hernández and seized several items, including a pair of muddy boots, pants, a glove, soil samples, and floor mats, from the premises.

Lizardi's backpack was then discovered in Luquillo, down the road from Hernández's home, at a location also just a mile from where Casey lived. It contained clothes and a towel with hair on it that law enforcement concluded was not Casey's, although no tests were conducted to ascertain whose hair it was. A few days later, Lizardi's body was also found in Luquillo, down a hill in a wooded area behind an abandoned structure that contained traces of blood. FBI analysis identified DNA from swabs taken of

the abandoned structure, Lizardi's truck, the twenty-dollar bill from the parking lot, and the blood-stained flip-flops, as Lizardi's.

## B. Procedural History

In February 2007, a grand jury returned a three-count indictment charging Casey with (1) carjacking with the intent to cause death or serious bodily injury (18 U.S.C. § 2119(3)); (2) possession, use, discharge, carrying of firearms during a crime of violence resulting in another's death (18 U.S.C. § 924(j)); and (3) being a felon in possession of a firearm (21 U.S.C. § 922(g)(1)). Casey pleaded not guilty on all counts. That July, the government filed a notice of intent to seek the death penalty.

Pretrial proceedings took place over six years, mostly concerning the death penalty. Suppression motions were heard in the fall of 2011 and rulings issued in January 2013. Casey moved to suppress the evidence discovered in his bedroom on the ground that his grandparents had neither actual nor apparent authority to consent to the warrantless search, arguing the search was unlawful and the evidence it yielded inadmissible. Finding that the room routinely remained unlocked and that Casey's grandparents had permission to enter it on a regular basis, the district court denied this motion. Casey also moved to suppress Algarín's photo array identification from the Fajardo parking lot; statements elicited from him allegedly in violation of his Miranda rights;

words he exchanged with his wife while in custody; and photos of Lizardi's decomposing body. These motions were denied as to all but certain statements the district court concluded Casey made after invoking Miranda protections.

In September 2012, the district court held a hearing on ethical misconduct allegations lodged by the government against defense counsel. Casey's subsequent motion to disqualify the district court judge based on claims of impartiality and improper ex parte communication with the government was denied.

Juror questionnaires were completed in October and November 2012. Voir dire was held in February 2013. The district court rejected Casey's Batson challenge to the government's peremptory strikes of three black panelists. Trial then commenced in March.

Casey argues that a number of erroneous rulings at trial amounted to a violation of his right to confrontation and to present a defense. In particular, he contends it was improper to preclude evidence which would have shown that the PRPD declined to properly investigate the possible involvement of Hernández, the dealer with whom the August 1, 2005, drug buy had been arranged, in Lizardi's death. The subject of such purported evidence included a PRPD internal investigation into its own possible negligence in the planning and execution of Lizardi's undercover operation.

After nine days of trial, the jury returned a verdict of guilty as to all counts but rejected the death penalty. A judgment of conviction was entered on June 13, 2013, and Casey was sentenced to life in prison. This appeal followed.

## II. Discussion

### A. Prosecution's Use of Peremptory Challenges

Casey, a black American transplant from Brooklyn to Puerto Rico, argues the district court erred in finding no equal protection violation in the government's exercise of peremptory challenges to exclude three black persons from the jury, he claims, solely on the basis of race.

#### 1. **Batson** Challenge

In Batson v. Kentucky, the Supreme Court reaffirmed the longstanding principle that a criminal defendant's equal protection rights are violated when jury selection at his trial is "affected by invidious racial discrimination." United States v. Girouard, 521 F.3d 110, 112 (1st Cir. 2008). The "[e]xclusion of black citizens from service as jurors," stated Batson, "constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." Batson v. Kentucky, 476 U.S. 79, 85 (1986). While Batson initially focused on whether the defendant or an excluded juror was part of a cognizable racial group, subsequent cases broadened Batson doctrine to encompass an individual juror's right not to be discriminated against -- making the relevant query

-8-

whether "a peremptory challenge was based on race." See Sanchez v. Roden, 753 F.3d 279, 292 (1st Cir. 2014) (quoting Snyder v. Louisiana, 552 U.S. 472, 476 (2008)).

Batson outlined a three-part burden-shifting framework, a "Batson challenge," through which a defendant can dispute the government's use of peremptory strikes as racially motivated and demonstrate an equal protection violation. See Foster v. Chatman, No. 14-8349, 2016 WL 2945233 at *8 (U.S. May 23, 2016). The defendant is required to first make a prima facie showing that race formed the basis for a peremptory challenge. The trial court must consider all relevant "circumstantial and direct evidence of intent as may be available" to determine whether an inference of racial motivation may be drawn. Batson, 476 U.S. at 93, 96 (quoting Arlington Heights v. Met. Hous. Dev. Corp., 429 U.S. 252, 266 (1977)). For instance, a "pattern" of strikes against black jurors, a "prosecutor's questions and statements during voir dire examination and in exercising his challenges," Sanchez, 753 F.3d at 292 (quoting Batson, 476 U.S. at 97), or the light a later strike may shed on an earlier one, can support an inference of discriminatory purpose, Snyder, 552 U.S. at 478 (noting that persisting doubt as to a particular strike requires the court to consider another strike for the bearing it might have on the previous challenge); United States v. Charlton, 600 F.3d 43, 55 (1st Cir. 2010) (Lynch, C.J., concurring) (noting that seemingly

-9-

permissible individual strikes may need "a second look" if, when taken together, they "create a concern that certain groups are underrepresented").

If the defendant makes out a prima facie case, the burden then shifts to the prosecution to offer an explanation for striking the juror in question. The proffered explanation must not only be racially neutral, but also "related to the particular case to be tried." Sanchez, 753 F.3d at 292-93 (quoting Batson, 476 U.S. at 98). Finally, based on these showings, the trial court must decide whether the defendant has demonstrated purposeful discrimination. Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003).

Statistical evidence is frequently used to show impermissible discrimination. Courts look to the percentage of a particular racial group removed from the venire by the strikes at issue, and the percentage of strikes directed against members of that group. Aspen v. Bissonnette, 480 F.3d 571, 577 (1st Cir. 2007). A prosecutor's intent may also be discerned by comparing the treatment of white and non-white panelists. An instance where a prosecutor's stated reason for striking a non-white potential juror would apply to a white panelist who was permitted onto the jury could serve as evidence of purposeful discrimination at the final step of a Batson challenge analysis. Miller-El v. Dretke, 545 U.S. 231, 241 (2005); Aspen, 480 F.3d at 577.

-10-

Here, the district court did not specifically find, but rather assumed, that Casey satisfied his burden at <u>Batson</u>'s first step to show a prima facie case of discrimination. According to Casey, however, the district court nevertheless committed clear error at the third step by accepting at face value the prosecutor's race-neutral explanations, rather than offering the defense an opportunity to expose the explanations as pretextual. While we conclude a <u>Batson</u> error was in fact committed here, because the error was without doubt harmless, we affirm.

### 2. Standard of Review for <u>Batson</u> Challenge Ruling

We review a district court's factual determination that the government was not motivated by race for clear error, and may reverse only where we arrive at a "definite and firm conviction that a mistake has been committed." <u>United States</u> v. <u>González-Meléndez</u>, 594 F.3d 28, 35 (1st Cir. 2010); <u>Charlton</u>, 600 F.3d at 50. We are mindful that only the trial court observed first-hand "the demeanor of the attorney who exercise[d] the challenge, along with whether [each stricken panelist's] demeanor can credibly be said to have exhibited the basis for the strike." <u>United States</u> v. <u>Mensah</u>, 737 F.3d 789, 796 (1st Cir. 2013) (internal quotation marks omitted).

### 3. Voir Dire

The jury pool contained 457 individuals, 13 of whom self-identified as black, 4 as black/Hispanic, and 1 as Puerto

-11-

Rican/black (18 total black). The rest of the pool contained 256 Hispanic/Latino persons, 30 Caucasian, 58 no answer/unrecognizable, and small numbers of other race/ethnicity combinations. Of the 18 panelists who self-identified as black, 13 were not called or were excused at parties' stipulation. Of the remaining 5, Casey and the government each struck 2 and 1 was chosen as an alternate.

The 2 self-identified black jurors stricken by the government were numbers 182 and 354.[1] Casey moved to reinstate those two. He also moved to reinstate stricken Juror 175, who had not self-identified as black, but rather as "Latin." Casey nevertheless himself claimed this potential juror was black, arguing that she appeared dark-skinned, spoke in a manner consistent with being black, and was Brooklyn-born.

The government responded that these three jurors were stricken not for race-based reasons, but because they had demonstrated they were incapable of serving on the jury in a death penalty-eligible case. Specifically, it stated all three had indicated an unwillingness to apply the death penalty according to the law or in the facts of the instant case, even if the government could prove them true.

---

[1] Jurors 182 and 354 had identified themselves as "black" and "black Hispanic," respectively.

Crediting the government's race-neutral explanations for its peremptories, the district court denied Casey's challenge. It held that because Juror 175 had not self-identified as black, Casey failed to make a prima facie case of purposeful discrimination; but that even if she was black, "she expressed reluctance to apply the death penalty in cases where the victim was not a child, elderly, or otherwise a defenseless victim." As for Juror 182, who self-identified as "Catholic (Black)," the district court looked to his statement on his questionnaire and at voir dire that the death penalty "is inhuman." Finally, with regard to Juror 354, who first identified as Hispanic and later modified this to "Hispanic black," the district court concluded the government's peremptory strike was not racially motivated because her response to a hypothetical in which a defendant killed an unarmed law enforcement officer was that life in prison, not the death penalty, would be the appropriate punishment; Juror 354 did, however, say she could take into account other aggravating factors to consider the death penalty.

### 4. Discussion

There was no clear error in rejecting Casey's Batson challenge on its merits. The district court was not convinced Casey made out a prima facie case, but nevertheless assumed as much, and proceeded to reject Casey's challenge at Batson's subsequent steps.

-13-

This was fortunate because the record demonstrates a Batson error was in fact committed here, and we would be remiss not to address it even though it changes little for Casey. Specifically, the parties and the district court labored under the misimpression that the defendant must be of the same race as the stricken juror in order to raise a Batson challenge. The district court even denied one of Casey's challenges on this very basis. This runs afoul of Powers v. Ohio. 499 U.S. 400, 402 (1991) ("[A] criminal defendant may object to race-based exclusions of jurors effected through peremptory challenges whether or not the defendant and the excluded juror share the same races.").

The error was, nevertheless, harmless. Casey, whose Batson challenge was based almost entirely on numbers alone, stresses that the prosecution's use of 3 of its 14 peremptory challenges on blacks "strongly suggests that something more than chance was at work." But the venire contained very few persons who self-identified as black to begin with, especially after the various excusals and stipulated dismissals. This is materially different from where "the numbers are larger and the pattern is inescapably apparent." Mensah, 737 F.3d at 801.

Casey's arguments on appeal misstate the statistics at the crux of his argument. For instance, he claims the government's use of the 3 of its 14 peremptories against black prospective jurors constituted 42 percent of its peremptories; the actual

-14-

figure is 21 percent. He also asserts that 6.3 percent of the prospective jurors called for individual voir dire were black (14 out of 222); but he does not contest the government's representation that 18 individuals out of the entire 457-person venire pool self-identified as "Black or mixed Black race" -- which comes out to 3.9 percent of the pool. And just 3.7 percent of that pool (12 regular jurors and 5 alternates, 17 altogether out of the 457-person venire) made it onto the jury. "Thus, as is common, the numbers considered in isolation are inconclusive in determining whether [Casey] met his burden on step one." Sanchez, 753 F.3d at 303 (quoting Mensah, 737 F.3d at 802).

Casey's attempts to compare the opinions about the death penalty shared by stricken panelists and non-black venirepersons are also to no avail. First, he made no such argument before the district court. And on appeal, he declined to place it in his opening brief (which instead focuses on faulting the government for failing to strike other non-black jurors who were in favor of the death penalty). Only in his reply brief does he attempt to liken opinions of two stricken black panelists with those of non-black persons who were permitted to serve on the jury. Not only are arguments raised for the first time in an appellate reply brief ordinarily deemed waived, United States v. Eirby, 515 F.3d 31, 36 n.4 (1st Cir. 2008), the evidence underlying these arguments is hardly conclusive and would not pass the rubric of plain error

-15-

review which applies to contentions raised for the first time on appeal, United States v. Matos, 611 F.3d 31, 35 (1st Cir. 2010).[2]

Against Casey's scant evidence of discriminatory intent, we see no reason, nor do we see evidence in their questionnaires or voir dire testimony, to question the legitimacy of the government's proffered reasons for doubting the three jurors' abilities to impose the death penalty in accordance with the law, described above. Finally, it is simply untrue that the district court denied Casey an opportunity to argue the government's explanations for its strikes were pretextual. Casey's attorney did respond to the government's justifications for its strikes, simply stating that the reasoning offered "was not a valid basis to strike jurors." Had Casey wished to share additional arguments concerning pretext, he declined his chance to do so.

Finding no clear indications of purposeful discrimination in the record, we affirm the rejection of Casey's Batson challenge.

---

[2] For instance, while Juror 177 did, like Juror 354, express that the death penalty should be virtually automatic in cases involving the murder of a child or elderly person, Juror 177 circled "1" on a 1-10 scale on favor for the death penalty, 1 being the most strongly in favor of the death penalty a respondent could be. Juror 354, by contrast, circled "5," reflecting she was undecided.

**III. Fourth Amendment Challenge to Casey's Bedroom Search**

Casey claims error in the denial of his motion to suppress evidence seized from his bedroom located in his grandparents' home, because, he argues, the search was made without proper consent.

**A.   Third-Party Consent to Warrantless Searches**

The search of a person's home conducted in the absence of a warrant issued upon probable cause is presumptively unreasonable, but may be deemed permissible with valid consent. United States v. Vázquez, 724 F.3d 15, 18 (1st Cir. 2013).  A prosecutor who seeks to rely on the lawfulness of a search bears the burden to show the consent was "freely and voluntarily given." Bumper v. North Carolina, 391 U.S. 543, 548 (1968).  The voluntariness of a consent to search turns on an assessment of the totality of the circumstances.  United States v. Mendenhall, 446 U.S. 544, 557 (1980).  "Among the individualized factors bearing on the vulnerability of the consenting party are age, education, experience, intelligence, and knowledge of the right to withhold consent."  United States v. Barnett, 989 F.2d 546, 555 (1st Cir. 1993).

Consent is legally unavailing if given by a person who does not have authority to do so.  The consent of one who possesses "common authority" over premises or effects, or some other

sufficient relationship to the premises or effects, is valid as against the absent, nonconsenting person with whom that authority is shared. Schneckloth v. Bustamonte, 412 U.S. 218, 245-46 (1973).

Common authority is not, however, to be implied from the mere property interest a third party has in the property. See Stoner v. California, 376 U.S. 483, 487-88 (1964) (finding the warrantless search of a hotel room by consent of the hotel clerk, absent the guest's consent, unlawful); Minnesota v. Olson, 495 U.S. 91, 96-97 (1990) (finding that a defendant's status as an overnight guest in the upper unit of a duplex home was sufficient for him to claim a protected privacy interest in the premises, even though he was not given a key or left alone in the unit, and did not pay for his stay).

Rather, common authority arises from having a shared privacy interest in the premises or effects to be searched. United States v. Matlock, 415 U.S. 164, 171-72 (1974) (reasoning that through mutual use -- as opposed to mere joint access -- of the subject property, all co-inhabitants have assumed the risk that one among them might permit a search of their shared space); United States v. DiPrima, 472 F.2d 550, 551 (1st Cir. 1973) (finding search of defendant's room in his mother's house at the mother's consent lawful, where his younger brother shared the room and his

mother used the room's closet, and defendant was present upon officers' entry of the room and made no objection).

Yet, even where a party who gave consent did not have authority to do so, a search is not unlawful if the searching officer had a mistaken -- but objectively reasonable -- belief the party in fact had the requisite authority. Thus "when the invitation is accompanied by an explicit assertion that the person lives there," the relevant question is whether "the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." Illinois v. Rodriguez, 497 U.S. 177, 188-89 (1990) (finding search lawful due to "apparent authority," where a former co-tenant of the defendant suggested to police she lived there, calling it "our apartment," and used her key to bring them inside, where they found the defendant with drug paraphernalia and cocaine).

## B. Standard of Review

This court reviews the ruling on suppression de novo, accepting its underlying factual findings unless clearly erroneous.  United States v. Wurie, 728 F.3d 1, 2-3 (1st Cir. 2013).  The issue of consent to search is reviewed de novo.  United States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996).

## C. Background

The parties agree that the day after Casey's arrest and while he was in custody, PRPD and FBI agents obtained consent from Casey's grandparents, the Riveras, to search Casey's bedroom in their house, where Casey had resided since 2002. PRPD agents found the room door open, and taped it off upon arrival to preserve the room for the FBI to inspect.

The district court was faced with conflicting testimony from Mr. Rivera, on the one hand, and Agent Marrero and Lieutenant Nazario of PRPD and FBI Special Agent Villareal, on the other. It decided to afford "more credence to the testimony provided by [the officers than by] Rivera." In doing so, it reasoned that Mr. Rivera had contradicted himself about his employment status and admitted he had illegally avoided paying taxes, and further that while Mr. Rivera had motive to lie to protect his grandson, the testifying officers had no similar stake in the case.

At the suppression hearing, Mr. Rivera testified that the room was used only by Casey and contained only his personal belongings; that Casey paid rent whenever he was working; that the door had a lock and Mr. Rivera had a key to use only for emergencies; that Casey had told his grandmother Mrs. Rivera she could not enter the room, even to clean, and once moved out because

she had entered for housekeeping purposes; and that the officers made him nervous.

Agent Villareal's rebuttal testimony portrayed the situation quite differently. On the stand, he first recounted his conversation with Mr. Rivera, who appeared "comfortable and cooperative," and "wholeheartedly agreed" to an FBI search of the house. According to Agent Villareal, Mr. Rivera said Casey "could not afford to maintain his own household and provide his own food," so he received lodging and food "for free" with the Riveras. Agent Villareal further recalled that, when asked whether Casey lived in a specific room of the house, Mr. Rivera responded that Casey indeed resided in a room in the "posterior part of the house." Its "door did not have a lock," said Mr. Rivera, and both Riveras "had free access to the room at all times, since it was their residence." Agent Villareal's testimony then shifted to his conversation with Mrs. Rivera, who provided him with aligning information. She told Agent Villareal that Casey "did not have enough income . . . to support himself and had to live with [the Riveras] . . . rent free and was provided food by [the Riveras]." Mrs. Rivera also said to Agent Villareal that Casey's room "did not have a lock" and she "was free to come and enter at will."

Agent Marrero, who arrived at the Rivera home before the FBI, similarly testified that when she got there, Mrs. Rivera said

-21-

she had "no problem" with Agent Marrero's presence, or the search of the residence to which Mr. Rivera had given consent at the police station. Agent Marrero further recalled finding the door to Casey's room open, and taping it off to preserve evidence while she waited for the FBI to arrive. When Agent Marrero asked who could go into and use the room, Mrs. Rivera replied, "[o]nly the three of them."

While Agent Nazario did not specifically recall Mr. Rivera's response about who could enter the room, he, like the other agents, testified that Mr. Rivera readily offered consent and gave Agent Nazario no reason to believe he lacked authority to do so. "[O]n the contrary," testified Agent Nazario, "Mr. Rivera always identified himself as the owner of the house and as the one who can authorize [a search]." Agent Nazario furthered that Mr. Rivera "represented himself to be . . . the one that ordered people around there."

In deeming the search lawful, the district court emphasized heavily that Casey's grandparents cooperated fully with the search, readily giving both oral and written consent, and expressed no hesitation or lack of authority. It, in addition, relied on the law enforcement officers' testimony to conclude that Casey did not pay rent and did not lock his door, and that the

Riveras "had joint access to [Casey's] bedroom."[3]  The district court concluded that Casey's grandparents had both actual and apparent authority to consent to the search of Casey's room.

### D. Discussion

Casey argues that his grandparents did not have the requisite authority to consent to the search.  He bases this solely on Mr. Rivera's on-the-stand statements, which differ materially from what the Riveras told officers prior to the search at the Rivera home.  Indeed, the law enforcement officers recount that the Riveras affirmatively indicated they could freely enter and exit the room and treated it as a part of their home, and never once did the Riveras do or say anything to suggest otherwise.

There was no clear error in giving greater credence to the three agents' testimony than to Mr. Rivera's.  While their statements do differ materially from Mr. Rivera's assertions on the stand, the district court offered reasoning to back up its determination: "Rivera . . . has close ties to defendant . . . [and] may have been inclined to [protect] his grandson by providing testimony . . . inconsistent with the information which he previously gave to law enforcement agents . . . ."  Mr. Rivera

_____

[3] The district court also found that the Riveras "entered [Casey's] room regularly."  Casey challenges this finding as clearly erroneous.  We need not resolve his challenge, as we do not rely on this finding for our holding.

-23-

changed his tune between the time the officers asked to search Casey's room -- when he readily shared that he had full access to the room and authority to consent to its search -- and the moment he took the stand at the suppression hearing. That Mr. Rivera contradicted himself about his employment status provided further reason to discredit his on-the-stand statements.

The question is thus whether the district court was correct that the officers' testimony established that the Riveras had common authority to consent to the search of Casey's bedroom. The officers appear to have asked the Riveras very few questions. We encourage law enforcement officers in the future to obtain sufficient facts about a given living situation to not only give them the ability to assess the validity of third-party consent before initiating a search, but also to allow a reviewing court to make an assessment in the event that consent is later challenged.

Nevertheless, the facts that the officers had before them at the time of the search gave them sufficient reason to believe that the Riveras had full "run of the house," see United States v. Clutter, 914 F.2d 775, 777 (6th Cir. 1990), and concomitant authority to permit the search. The facts before the officers -- that the door to Casey's room was unlocked and open, that Casey did not contribute to rent or food, that Mrs. Rivera could enter the room "at will," and that Mr. Rivera "ordered people around" at the house and "had free access to the room at all

times" -- permitted the officers to infer that there was an arrangement in the residence that the Riveras could enter Casey's room if and when they wished. The Riveras' statements at the time of the search about their access to the room suggested a relationship a reasonable person could conclude is more akin to that between co-tenants, see Rodriguez, 497 U.S. at 179-80, than that between a hotel clerk and guest, see Stoner, 376 U.S. at 488. We thus agree with the district court that the Riveras had apparent authority to consent to the search, and we do not reach the question whether the Riveras had actual authority as well.

In so holding, we note that the facts of this case are different from those in United States v. Whitfield, 939 F.2d 1071 (D.C. Cir. 1991), one of the cases on which Casey relies. In Whitfield, the court held that a mother did not have apparent authority to consent to the search of her adult son's room. Id. at 1075. But there was no evidence that the mother said, as Mrs. Rivera did here, that she could come and go from her son's room "at will." Nor did Whitfield involve evidence that the mother represented herself to be the one who "ordered people around" at the house, as Mr. Rivera did. The court in Whitfield assumed that the officers in that case could infer only that the mother "generally" had "joint access" to the room, and so had the "ability" or "legal right, to enter" that room, id. at 1074 -- an inference that seemed to rest on little more than the facts of her

-25-

ownership and the door being unlocked. Here, by contrast, the statements made by the Riveras when questioned by the officers permitted the inference that there was an arrangement in the house whereby the Riveras could come and go from Casey's room at will.

Finally, Casey's contention that the Riveras' consent was not voluntary fails. While Mr. Rivera did testify that the presence of numerous officers at his home made him nervous, the record contains no suggestion that Mr. Rivera was coerced or threatened, or that he did not comprehend the officers' questions. He gave consent both at the police station before agents arrived at his home, and again just before the search commenced. He also did so in both English and in Spanish, orally and in writing. Moreover, according to the officers' testimony, the Riveras both appeared comfortable and at ease with the presence of law enforcement in their home. Accordingly, we affirm the district court's denial of Casey's motion to suppress evidence discovered in his bedroom.

## IV. Parking Lot Cashier's Photo Array Identification

Casey next challenges the order denying his motion to suppress the photo array identification made by Algarín, the marina parking cashier, as unduly suggestive. According to Casey, Algarín was subject to undue pressure upon making the identification. Casey additionally argues that he was not only

the darkest-skinned man in the array, but was the only black non-Latino, and thus the only individual pictured with "a distinct, long, thin facial structure, lacking the broad, flat face and wide cheekbones typical of Latinos of African descent."  He further objects because there was no in-court identification subsequent to the pre-trial array identification; Algarín merely authenticated the array he had earlier initialed.

## A.  Validity of Out-Of-Court Identifications

A court should exclude an out-of-court identification based on a photo array only in those "extraordinary cases" where there is "a very substantial likelihood of irreparable misidentification," a situation which could result in an unfair trial in violation of the defendant's due process rights.  United States v. Henderson, 320 F.3d 92, 100 (1st Cir. 2003) (quoting United States v. de Jesus-Rios, 990 F.2d 672, 677 (1st Cir. 1993)). "Short of that point, such evidence is for the jury to weigh . . . for evidence with some element of untrustworthiness is customary grist for the jury mill."  Manson v. Brathwaite, 432 U.S. 98, 116 (1977).

The defendant bears the burden to establish an out-of-court identification was infirm.  A two-step analysis is applied to such contentions:  (1) whether an "impermissibly suggestive" procedure was used, and (2), if so, whether the identification was

nevertheless reliable under a "totality of the circumstances." United States v. Rivera-Rivera, 555 F.3d 277, 283 (1st Cir. 2009). Factors pertinent to this second step include

> (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention to the crime; (3) the accuracy of the witness' prior description of the defendant; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.

United States v. DeCologero, 530 F.3d 36, 62 (1st Cir. 2008) (quoting Henderson, 320 F.3d at 100).

### B. Standard of Review

District court decisions denying motions to suppress pre-trial identifications are reviewed de novo, but with deference to any findings of fact. United States v. Brennick, 405 F.3d 96, 99-100 (1st Cir. 2005).

### C. Facts

A few days after the search for Lizardi commenced, in an interview with an FBI agent, Algarín described the driver of the gray truck from whom he had accepted the twenty-dollar bill as "a black male, approximately 25 years old, of average height with a slim build and black hair."

About five weeks later, Algarín was shown an array of six photos by another FBI agent, Agent Moulier, and asked if he could identify the person he had described. Agent Moulier testified at the suppression hearing that the photo array identification took place at Algarín's home in the presence of Moulier and three other officers.[4]

Casey's photo appeared in the middle of the top row of three photos, with another row of three photos below it. After about two minutes of studying the array, Algarín picked out Casey's picture.

Algarín did not testify at the suppression hearing. At trial, Algarín was again shown the photo array that he had marked with his initials eight years prior and repeated his identification of Casey's photo.

## D. Application

Casey offers no reason to believe, as he asserts, that "[t]he pressure on Algarín to make an identification . . . was undeniably overwhelming." The circumstances of the pre-trial identification were not unduly suggestive. The array contained

---

[4] According to Algarín's trial testimony, however, this took place at the home of the parents of Algarín's boss, whose brother was an agent seated at counsel's table during trial.

six black-and-white photos. As the district court noted, while Casey had the darkest complexion among them, each individual could have been described as black, and they shared relatively similar facial features, a near-identical haircut, and groomed eyebrows. See DeCologero, 530 F.3d at 62 (while officers creating a photo array must make "every effort reasonable under the circumstances" to conduct a "balanced representation," they need not "search for identical twins"). The array displayed no names, and bore a disclaimer in Spanish and English stating that the person the witness saw may or may not appear among the presented pictures. Agent Moulier testified the array was prepared according to "policy about the race, sex, skin color of the person," based on the descriptions Algarín and other parking lot witnesses gave of the gray truck's driver. While the record contains no documentation of the array assembly procedure or any report about the identification process, Casey points us to no authority requiring the government provide such evidence -- a point especially important here, where the defense bears the burden to demonstrate the identification was infirm. Nor does Casey suggest the officers who created the photo array and spoke to Algarín employed any improper suggestive or coercive tactics.

Even had the circumstances of the array identification been unduly suggestive, the identification was nevertheless reliable. Algarín had occasion to commit the truck driver's face

-30-

to memory during their interaction regarding the driver's lost ticket, which prompted Algarín to ask for the driver's name, address and phone number for a lost ticket form. The driver, furthermore, was unable to provide his license or registration documents, and told Algarín to keep the change from a twenty-dollar bill tendered for a parking fee Algarín testified could not have been more than two or three dollars.

Also, while general, Algarín's description of the driver is consistent with his selection from the photo array, made a few weeks after his earlier contact with a driver leaving a significant gratuity. See id. at 61-63 (finding no issue with an array identification made two to three years after the incident). The district court thus did not err in denying Casey's motion to suppress this photo array identification evidence, and we affirm its ruling.

## V. Miranda Challenge to Admission of Statements Made to Officers While in Custody

Casey next appeals the order granting in part and denying in part his motion to suppress statements he made while in custody. He contends the district court erred in failing to suppress statements elicited by interrogation after he invoked his right to remain silent, and in its factual determination of when Casey invoked his right to an attorney. The district court further

erred, argues Casey, in finding admissible statements overheard by a law enforcement officer that Casey made to his wife, Crystal Peña, while in custody.

## A. **Miranda** Rights

Admissibility of statements made after the right to remain silent has been invoked depends on whether, under a totality of the circumstances, the right was "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 104 (1975). In addition, Miranda protection extends to statements made in response to "any words or actions on the part of the police . . . that [they] should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

## B. Standard of Review

This court reviews matters of law related to denial of a motion to suppress de novo, while reviewing underlying findings of fact only for clear error. We must uphold the district court's denial of a motion to suppress if any reasonable view of the evidence supports doing so. United States v. Rojas Tapia, 446 F.3d 1, 3 (1st Cir. 2006).

## C. Facts

Upon his arrest, Casey was taken to PRPD headquarters and signed a form acknowledging he had been informed of his rights

before answering questions from PRPD Agent Diana Marrero in the early hours of August 2. At the suppression hearing, Agent Marrero testified that she both read the form to Casey in Spanish and witnessed him read and voluntarily sign the form, both writing "sí," "yes" in Spanish, and verbally indicating his willingness to speak with her.

Over the next several hours, Casey led officers to the homes of other individuals in the drug trafficking world, purportedly cooperating with their search for Lizardi. After this excursion turned up no clear leads, Casey was taken to another PRPD station at Canóvanas, where the FBI assumed jurisdiction over him at around 6:00 a.m. While Agent Marrero did not interview Casey at Canóvanas, she testified at trial that while he was there, Casey asked to see his grandfather and told Agent Marrero he was no longer interested in speaking with law enforcement. Casey's grandfather arrived at that point and gave consent to the search of Casey's bedroom. Casey was, in the meantime, transferred to the Luquillo precinct, and then to FBI premises in Ceiba, shortly after noon on August 2.

At Ceiba, Agent Luis Moulier read Casey his <u>Miranda</u> rights and Casey exercised his right to remain silent. Agent Moulier refrained from further questioning.

Close to 2:00 p.m. that afternoon at Ceiba, Agent Marrero approached Casey once more, this time confronting him with the evidence found in his bedroom. She did not repeat his Miranda rights before initiating this conversation. Casey responded with statements whose admission he now challenges: "maybe he is alive, maybe he is dead." When pushed for details, Casey refused to elaborate, stating only that "there [was] already enough evidence," and he would "go down" with that evidence. Agent Marrero recalls then appealing to Casey's emotions as a "family man," asking him to share any details he could about Lizardi's location in case Lizardi was still alive and could be rescued. To this, Casey responded, "I don't know what you are talking about." At some point in the course of this exchange, Casey asserted his right to an attorney.

Casey's suppression motion concerns one additional interaction that day. Shortly after 4:00 p.m., agents permitted Casey's wife Peña and their infant child into an interview room where Casey was handcuffed to visit with him in the presence of Agent André Vachier-Serrano. In his exchange with Peña as overheard by Agent Vachier-Serrano, Casey made statements including "[k]illing a cop is a federal case," and "[T]hey seized a lot of evidence at the house but they don't have the body, anyway, he was an undercover cop and he knew he was on his way to do a drug deal with me and could come out dead or alive," which

Casey now contends the district court erred in declining to suppress.

In this same conversation, Casey also advised Peña to obtain employment certificates from his social worker and change the dates on them to obtain a loan. Their exchange also included reference to some prior offense "when they got us with drugs and we came out." Casey asserts this entire interaction comprised an unconstitutional interrogation, and none of its content should have been admitted.

The district court granted in part and denied in part Casey's motion to suppress the statements made to Agent Marrero at Ceiba and those overheard by Agent Vachier-Serrano. Below, Casey contended to no avail that all his statements to Agent Marrero should have been suppressed because he was assaulted upon arrest, leading him to waive his Miranda rights involuntarily. The district court found no evidence to substantiate the purported assault, and ruled that even had Casey been assaulted, the waiver he gave at PRPD headquarters was voluntary. Finding that Casey had, however, asserted his right to counsel during his interview with Agent Marrero at Ceiba just before Agent Marrero appealed to Casey's sensibilities as a father, the district court suppressed Casey's statements made thereafter. Finally, the district court concluded that Casey's conversation with Peña was not a custodial

interrogation or equivalent to FBI questioning, and declined to suppress any of what Agent Vachier-Serrano overheard.

## D. Application

On appeal, Casey again argues all his statements to Agent Marrero should have been suppressed. He asserts that the invocation of his right to remain silent at Canóvanas and again at Ceiba with Agent Moulier, prior to the Ceiba interview with Agent Marrero, should have rendered all his statements to Agent Marrero at Ceiba inadmissible.

While Miranda does not categorically forbid the resumption of questioning once a person in custody has asserted his or her rights, under Mosley, whether statements obtained after the detained person has decided to remain silent are admissible depends on whether, under a totality of the circumstances, the person's "right to cut off questioning was scrupulously honored." 423 U.S. at 104 (internal quotation marks omitted). On appeal, Casey contends that questioning him after both instances in which he asserted his Miranda rights not to speak was impermissible under Mosley.

Casey made no such argument below. He rather proceeded on the theory that the alleged assault by PRPD officers rendered any waiver of his Miranda rights involuntary. He cannot now raise

a new basis for suppression, and accordingly we deem this argument waived.  <u>United States</u> v. <u>Torres</u>, 162 F.3d 6, 11 (1st Cir. 1998).[5]

Casey next claims error in the factual determination of the point in time during the Ceiba interview with Agent Marrero Casey at which invoked his right to an attorney.  Because it was impossible to tell, he argues, no part of the conversation should have come into evidence.  There was no clear error in placing Casey's invocation of his right to an attorney after his statement that Lizardi was "maybe alive" or "maybe dead" but before Agent Marrero's appeal to his values as a father, and admitting only part of the conversation accordingly.  Agent Marrero testified as much, and her notes corroborated this finding.

Finally, the district court was correct to conclude that Casey's conversation with his wife was not the result of an

_____

[5] Even if his assertions on appeal about his earlier invocations of the right to remain silent are accurate and not waived, statements made after a defendant has invoked his right to remain silent may nevertheless be admissible.  Factors to determine whether such statements should be admitted include the time elapsed between interrogations, the provision of fresh <u>Miranda</u> warnings, the scope of the follow-up interview, and the zeal of the officers in pursuing questioning.  <u>Mosley</u>, 423 U.S. at 104-06; <u>United States </u>v. <u>Hsu</u>, 852, F.2d 407, 410 (9th Cir. 1998).  It is not in dispute that several hours passed between interviews, and that Casey was moved to different locations.  He moreover offers no indication that the officers approached him with any particularly coercive tactics.

interrogation.  "A volunteered statement is not the product of interrogation and not subject to suppression, even if warnings have been provided."  United States v. Jackson, 544 F.3d 351, 357 (1st Cir. 2008).  Casey offers no evidence that the FBI brought Peña in for interrogation purposes.  Rather, the record reflects that she had been following Casey to the various locations he was taken and wanted to meet with him of her own volition.  See Arizona v. Mauro, 481 U.S. 520, 530 (1987) (a defendant's voluntary statements to his spouse while in custody overheard by law enforcement need not be suppressed).  Casey also does not dispute that he was fully aware Agent Vachier-Serrano was present and within earshot.  We therefore affirm the district court's order granting in part and denying in part Casey's motion to suppress statements he made while in custody.

## VI.    Challenge to Admission of All Statements Due to Lack of Prompt Presentment

Casey argues for the first time on appeal that all of his statements should have been suppressed for failure to promptly bring him before a magistrate judge.  He admits, however, that he declined to raise this argument below.  Motions to suppress must be raised prior to trial, and failure to do so in a timely manner constitutes waiver.  Fed. R. Crim. P. 12(b)(3)(C); United States v. Dietz, 950 F.2d 50, 55 (1st Cir. 1991) ("Arguments not seasonably addressed to the district court may not be raised for

the first time in an appellate venue.").  Casey offers no authority to suggest otherwise.  We therefore deem this argument waived.

## VII. Challenge To Alleged Trial Errors Infringing Casey's Right to Confrontation and to Present a Defense

Next, Casey urges that the district court committed a series of errors throughout his trial, including: (1) admitting irrelevant and unduly prejudicial evidence under Federal Rule of Evidence 404(b), specifically statements he made to Peña while in custody and photographs of Lizardi's body; (2) limiting Casey's cross-examination of agents about investigation efforts prior to August 1, 2005; and (3) rejecting under Daubert the preliminary report from an internal PRPD investigation and its recommendation of sanctions against several involved officers.

### A.  Standard of Review

Preserved evidentiary objections are reviewed under an abuse of discretion standard.  This court must nevertheless affirm even where it finds error, as long as it deems the error harmless. United States v. Rosado-Pérez, 605 F.3d 48, 54 (1st Cir. 2010). A series of evidentiary issues, none of which individually warrants reversal, may have a cumulative effect, rendering the trial unfair. United States v. Sepúlveda, 15 F.3d 1161, 1195-96 (1st Cir. 1993). Where, as here, the argument that trial errors had a cumulative effect upon a defendant's right to confrontation and to present a

defense is raised for the first time on appeal, review is under a plain error standard.  United States v. Sánchez-Berríos, 424 F.3d 65, 73 (1st Cir. 2005).

## B.  Irrelevant and Unduly Prejudicial Evidence

### 1.  Federal Rules of Evidence 402, 403, and 404(b)

Rules 401 and 402 provide that all "relevant" evidence, or that which has a "tendency to make a fact more or less probable than it would be without the evidence," is admissible.  However, under Rule 403, "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Under Rule 404(b), evidence of past wrongs is not admissible character evidence to demonstrate a defendant's propensity to behave in a certain manner.

### 2.  Application

#### a.  Casey's Statements to Peña

Agent Vachier-Serrano first testified as to statements Casey made to his wife about falsifying an employment certificate, described above.  The court denied a hearsay objection and granted a relevance objection.  It then gave a limiting instruction to the jury, stating that because the "references to fraudulent conduct

. . . ha[ve] no bearing on the nature of the charges . . . you may disregard."

The government then elicited further testimony from Agent Vachier-Serrano about the current investigation and a reference Casey made to a prior case. He recalled statements from Casey such as "in the house they seized a lot of evidence but that they weren't going to find the body," "[Casey] was going to come out of this case well," and "reference to another case, a drug case that he had with [Peña] . . . [a]nd they had come out of the case okay." Casey's relevance objection was overruled.

Casey argues, for the first time on appeal, error in the refusal to strike the testimony about falsifying an employment certificate, and denial of his objection to Agent Vachier-Serrano's reference to the prior drug offense. Casey contends this evidence had no probative value, and was merely introduced for the impermissible purpose of showing propensity.

There was no plain error in finding to the contrary. The limiting instruction as to Casey's instructions to Peña to falsify an employment certificate made clear to the jury that the fraudulent conduct Casey was describing to Peña had no bearing on this trial. See United States v. Williams, 717 F.3d 35, 42 (1st Cir. 2013).

Nor does the court's rationale to permit Agent Vachier-Serrano's testimony about the prior drug case constitute an abuse of discretion. While it is conceivable that Casey's statements about the prior drug offense perhaps reflected his consciousness of guilt, any such error was likely harmless. Other evidence alerted the jury to Casey's ties to the criminal underworld; it was, indeed, no secret that Casey led the police around for several hours just after his arrest to point out to them other drug traffickers with possible tips on Lizardi's whereabouts. It is doubtful that knowledge of an unspecified prior drug offense could convince a jury to convict Casey of the charges in this case.

### b. Photographs of Lizardi's Body

The government introduced nearly twenty photos of Lizardi's decomposing body. Five were admitted, over objection, through a PRPD sergeant's testimony about following the body's stench to locate it; fourteen were autopsy photographs to show bullet trajectories, to which Casey did not object; and two, to which Casey did object, were of the body at different angles, showing what it looked like after it was recovered. Copies of only the last two were provided for this court's review on appeal. Casey contends the objected-to photos were irrelevant and inappropriately submitted to spur an emotional reaction from the jury.

It is more than plausible that the first five photos corroborated various pieces of testimony:  the body had been dragged down the hill to its discovered location; Casey's statement to Peña that the body would be difficult to find; and the time it took to locate the body.  The jury received instruction prior to the photos' admission not to be swayed by emotion in viewing this evidence.  The last two photos might likewise have corroborated testimony that the body had been left outdoors for a few days.  See United States v. Cruz-Kuilan, 75 F.3d 59, 61 (1st Cir. 1996) (no abuse of discretion in admitting photographic evidence of victim's wounds in a carjacking case, as such evidence spoke to elements of the offense, including force, violence, and/or intimidation).

"A decision by the district court on a Rule 403 determination must stand absent a demonstration of extraordinarily compelling circumstances."  United States v. Lombard, 72 F.3d 170, 190 (1st Cir. 1995) (internal quotation marks omitted).  Casey makes no such demonstration with regard to these photos.  Especially among the array of other photographs and forensic evidence put before the jury, we do not find admission of two additional photos of the body as agents discovered it to rise to an abuse of discretion.

**C. Orders Limiting Cross-Examination of PRPD and FBI Agents**

According to Casey, the district court's rulings limiting cross-examination of Agents Agosto and Moulier, and Commander Morales, improperly prevented him from eliciting testimony essential to the theory of his case -- that another person, Hernández, was actually Lizardi's killer, and that the investigation had unduly zoomed in on Casey while ignoring leads pertaining to Hernández. Casey had hoped to demonstrate that internal administrative PRPD investigations had found officers negligent in planning the undercover drug buy which had resulted in Lizardi's death.

The Confrontation Clause of the Sixth Amendment guarantees criminal defendants the right to cross-examine witnesses who testify against them. United States v. Vega Molina, 407 F.3d 511, 522 (1st Cir. 2005). This right is not without limits, however; the district court wields considerable discretion to impose "reasonable limits" on cross-examination. United States v. Raymond, 697 F.3d 32, 39-40 (1st Cir. 2012). We review de novo whether a defendant was afforded a reasonable opportunity to impeach a witness, and for abuse of discretion limitations the trial court imposed on that opportunity. Id.

### 1. **Agent José Agosto**

Agent Agosto was Lizardi's supervisor. Casey first argues he was prevented from impeaching Agent Agosto on the basis of a PRPD internal disciplinary investigation involving Agent Agosto. It is clear that the district court did not abuse its discretion in limiting questioning on this subject, however. After a sidebar dispute about whether defense counsel could ask about the investigation's preliminary findings -- that Agent Agosto had acted negligently -- as opposed to its ultimate conclusion of no negligence, the court permitted defense counsel to question Agent Agosto about the former as long as counsel made clear that it had been a preliminary decision. As cross-examination was not materially limited here, we conclude there was no error. Even had questioning been limited, preliminary investigatory results contradicted by a final determination have limited probative value, and pose the risk of engendering significant confusion for jurors. Fed R. Evid. 403.

Casey also argues abuse of discretion in keeping him from impeaching Agosto based on purportedly conflicting statements about whether Lizardi, Casey and Hernández met a few days before the events of August 1, 2005. On the stand, Agent Agosto testified Hernández and Lizardi did not meet on July 28, 2005, days before the events of August 1. Defense counsel moved unsuccessfully to

introduce, as a prior inconsistent statement, a report prepared in 2005 by Agent Agosto documenting that such a meeting did occur, on information Lizardi had shared with Agosto at that time.  While the district court excluded the report, it did allow defense counsel to question Agent Agosto about the July 28 meeting.  Agent Agosto's answers revealed that Lizardi, with Casey at the Holiday Inn, spoke to Hernández by phone on July 28 to plan the August 1 drug buy (although Agent Agosto maintained that Hernández was not present in person).

Any error by the court here was certainly harmless. Casey was able to use Lizardi's telephone records to impeach Agent Agosto's testimony to show that Lizardi did speak to Hernández on July 28.

### 2.  Commander Morales

The district court similarly did not err in limiting Morales's testimony to events on August 1, 2005, and thereafter as direct examination covered only the events on and after August 1. The court informed Casey of his right to call Morales as a defense witness to elicit testimony about the July 28 meeting that purportedly took place prior to August 1.  In addition, Morales testified that he had never met Lizardi, and admitted that his information was based on reports from other officers, introducing several levels of hearsay.

### 3. Agent Moulier

Casey further contends the district court abused its discretion in limiting questioning about Agent Moulier's review of investigative reports describing Lizardi's contacts with Hernández. Agent Moulier testified extensively about efforts to investigate Hernández and evidence gathered against him; it was not an abuse of discretion to find questions about Hernández being the drug buy contact duplicative.

Casey's additional arguments that these limitations precluded him from contending that authorities "dropped the ball when they failed to follow up on statements and evidence in their hands implicating Hernández" is also without merit. While the court did exclude statements deemed improper opinion testimony from a non-expert witness, it did permit Casey's counsel to elicit a critical point on cross-examination -- that hair found on the discovered black backpack did not belong to Casey or Lizardi (with the caveat that the results could have been affected over time), but was not tested against Hernández.

### D. Police Practices Expert Testimony

According to Casey, the district court further abused its discretion in precluding him from presenting a police practices expert, Dr. William Gaut. Casey's intent was to have Dr. Gaut opine on whether the undercover operation was planned up to

standards. While Casey stresses on appeal the relevance of Dr. Gaut's testimony, Dr. Gaut testified that he never saw any PRPD standards or policies for undercover work; and that he was not even aware whether the FBI or PRPD were part of the Commission for Accreditation of Law Enforcement Agents. The district court furthermore reasoned that such evidence could confuse the jury, tasked with deciding Casey's culpability, not whether PRPD committed negligence. It was hardly an abuse of discretion for the district court to exclude expert testimony from someone with little apparent knowledge of the standards with which FBI and PRPD investigations must comply. See Ruiz-Troche v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 81 (1st Cir. 1998) (expert testimony must be reliable, as well as relevant in the sense that "the expert's proposed opinion, if admitted, likely would assist the trier of fact to understand or determine a fact in issue").

**E. PRPD Internal Investigator Rodríguez-Torres Testimony and Report**

Nor was there an abuse of discretion in refusing to allow testimony from a PRPD internal affairs investigator, Agent Carlos Rodríguez-Torres, and his preliminary report finding negligence in the planning of Lizardi's undercover operation, to impeach Agent Agosto's testimony. Significant confusion arose before the district court over whether sanctions were recommended in the report (they were not -- the recommended approach was ultimately

reduced to orientation training), and whether it represented a final administrative determination.

Moreover, it became clear that Agent Agosto had never seen this preliminary report, and thus could not be impeached with its contents. Finally, the government was unable to demonstrate that the officers whose statements appeared in the report had personal knowledge of the events they were describing -- or, for that matter, that Agent Rodríguez-Torres had sufficient personal knowledge. See Fed. R. Evid. 602. The district court thus did not abuse its discretion in excluding testimony concerning the Rodríguez-Torres report.

## F. Cumulative Effect

Casey argues the cumulative impact of this purported litany of errors precluded him from receiving a fair trial. Even if some, or all, of the above decisions were mistakes, they appear to concern evidence tangential to the government's case against Casey. Indeed, even had Casey been able to implicate Hernández as the more likely perpetrator with some of the above evidence, or to undermine the PRPD's credibility, he would not have been able to eviscerate the positive evidence against him.

This court is to weigh trial errors "against the background of the case as a whole," paying attention to factors including "the nature and number of errors committed; their

-49-

interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose" and "the strength of the government's case." Sepúlveda, 15 F.3d at 1196. Given our determinations that the district court did not abuse its discretion in making any of these rulings -- let alone commit harmful error -- we find no cumulative impact on the fairness of the trial Casey received.

## VIII. Confrontation Clause Challenge to Expert Witness Testimony

For the first time on appeal, Casey argues his Sixth Amendment right to confrontation was violated when a purported surrogate witness, Carna Meyer, testified to introduce three DNA evidence reports. Specifically, Casey argues that under Bullcoming v. New Mexico, 131 S. Ct. 2705, 2713 (2011), he was unconstitutionally deprived of any chance to face the biologist whose work underpinned the conclusions drawn by the reports about which Meyer testified.

### A. Standard of Review

Objections forfeited below are reversible for plain error. Fed. R. Crim. P. 52(b); United States v. Olano, 507 U.S. 725, 732 (1993) ("plain errors" are "defects affecting substantial rights"). By contrast, where a defendant has affirmatively waived his or her objection, or, in other words, conveyed a "considered

decision not to avail [him or her]self of a procedural right," we need not even search.  United States v. Medina, 427 F.3d 88, 91 (1st Cir. 2005) ("[O]ur even contemplating a claim of error [in such a case] would imply an obligation on trial judges to second-guess counsel in a way that would disturb that entitlement.  This will not do.").   Here, via his counsel, Casey affirmatively announced he had no objection to admission of Meyer's testimony and the three reports, and cannot now claim a violation of constitutional rights merely to reverse course on a trial strategy that proved unsuccessful.

## B.  Background

Before trial, expert Brendan Shea had prepared a report based on analysis of the gathered physical evidence, which showed that DNA from the twenty-dollar bill matched Lizardi; DNA from the floors and swabs of the abandoned structure matched Lizardi; and Lizardi was "potentially the major contributor" of DNA on the flip-flops found in Casey's bedroom.  The report was not signed or certified by anyone but Shea.

The government originally designated Tina Delgado as the witness who would introduce the report.  Casey moved under Crawford v. Washington, 541 U.S. 36 (2004), Melendez-Diaz v. Massachusetts, 557 U.S. 305, 309 (2009), and Bullcoming, 131 S. Ct. at 2713, to exclude her testimony on the grounds that Delgado

-51-

did not bear a sufficient connection to the scientific testing involved in the report's preparation.  The government committed to examining whether Delgado's testimony would comply with evidentiary rules and to supplying an appropriate witness, and the motion was denied without prejudice as concerning an issue not yet ripe.

On the eve of trial, the government designated two additional DNA reports authored by Meyer, as well as Shea's report. It then called Meyer to introduce all three.  Regarding Shea's report, Meyer testified that she had "reviewed all of the data, the notes, and the underlying paperwork" and "agreed with all of its interpretations."  Critical here is that when the government moved to admit the three reports into evidence, the district court asked Casey if there were any objections -- to which his counsel squarely replied, "[n]o, Your Honor."  Nor did Casey lodge a single objection to Meyer's endorsement of Shea's report, or her subsequent testimony about all the reports' specific results.  And during a sidebar the next day on a separate issue, Casey's counsel affirmed this stance, stating the defense "ha[s] not disputed the DNA."

## C.  Application

Given Casey's express waiver -- offered after the government made clear its intent to admit all three reports with

-52-

Meyer's testimony, and tainted by no subsequent indications of misunderstanding or regret prior to this appeal -- we have little further to do in the way of analysis, and must deny his objection without reaching its merits. United States v. Soto, 799 F.3d 68, 96 (1st Cir. 2015) (declining to reach the merits of a confrontation objection raised on appeal, where the circuit interpreted the defense's silence below to indicate the defense saw nothing objectionable).[6]

## IX.  Denial of Recusal Motion

---

[6] It may nevertheless be worth briefly examining how this move might have been an intended tactic of Casey's trial strategy.  At closing, Casey's counsel neatly summed up their theory of the case: that the PRPD and FBI investigation was so affected by "tunnel vision" that it leapt to pin Lizardi's death on Casey without adequately investigating other potential suspects, chiefly Alexander Hernández.  It was in service of this narrative that, throughout the trial, Casey's counsel highlighted how the FBI could have collected more DNA samples and conducted more DNA tests that could have implicated Hernández.  One such instance, she argued, was when the blood on Casey's sandal was revealed to contain "a mixture of DNA," indicating "more then [sic] one contributor," but was not subjected to further analysis.  Such a strategy, we think, hinged on the accuracy and admission of the FBI's DNA analyses.  There otherwise would have been little reason for the jury to believe that more testing would have led the FBI to Hernández.  Although this is mere speculation on our part, Casey, it appears, had plausible reason to welcome admission of the government's DNA reports.

Casey's final challenge concerns his unsuccessful motion for the district court's recusal after it initiated a disciplinary proceeding against the defense, prior to the start of his criminal trial. The disciplinary proceeding was based on a complaint the government lodged asserting that Casey's team had interviewed Hernández without permission from his counsel, and asked him to recant in exchange for help in a related state court case.

While investigation of the defense's purported misconduct was referred to another judge, Casey's particular objection and reason for requesting recusal was that, in the course of the proceeding, the district judge allegedly met with the prosecution ex parte for assistance reviewing subpoenaed evidentiary documents. Casey also contends that the mere fact that the district judge undertook such an ethics investigation so close to the eve of trial created an impermissible appearance of impropriety.

**A. Rules of Recusal**

According to 28 U.S.C. § 455(a), any judge or justice shall disqualify him or herself in any proceeding where his or her impartiality might reasonably be questioned. Canon 3(A)(4) of the Code of Conduct for United States Judges states that judges should not initiate or consider ex parte communications on pending matters. It does provide the exception, however, that ex parte

communication is permissible for administrative purposes, only if it is limited to non-substantive matters and the judge reasonably believes no party will gain an advantage as a result.

## B.  Standard of Review

A district court's decision not to recuse itself is reviewed for abuse of discretion.  United States v. Pulido, 566 F.3d 52, 62 (1st Cir. 2009).  This court must sustain the district court's ruling unless it can find the decision was not reasonable and is unsupported by the record.  Id.

## C.  Background

The district court maintained that communications with the government about the subpoenaed documents were limited to determining whether the documents were irrelevant and sent to chambers in error.  Casey does not contest that the judge's secretary asked the prosecutor to come review the documents, or that the government's interaction with the judge was minimal.  The record does not suggest that the prosecutor and judge at any point discussed the merits of Casey's case, reviewed the substance of the documents together, or had any other substantive exchange.

## D.  Application

Casey has not brought to light facts on which we might find the district court abused its discretion in declining his

recusal motion. It was within the pale of the district judge's duties to act on the ethical misconduct allegations; and it even took the step of referring the misconduct proceeding to another judge, altogether severing its fate from that of Casey's criminal proceedings. Casey also points to no evidence that the government's ex parte communications with the district judge involved either the merits of his criminal case or the ethical misconduct allegations. Cf. Haller v. Robbins, 409 F.2d 857, 859 (1st Cir. 1969) (finding a due process violation in a habeas case where the subject of an ex parte communication by the government to the sentencing judge was a hearsay statement about the petitioner's conduct). Without more, we must affirm the district court's ruling.

## X.   Conclusion

Casey appeals a host of district court decisions made before and during his jury trial. Upon careful consideration, and for all the above reasons, we affirm.

**AFFIRMED**