# United States Court of Appeals
## For the First Circuit

No. 11-1334

UNITED STATES OF AMERICA,

Appellee,

v.

JOSEPH ACEVEDO-MALDONADO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Lipez, Circuit Judges.

Anita Hill Adames, on brief for appellant.
Luke Cass, Assistant United States Attorney, with whom Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States Attorney, on brief for appellee.

October 12, 2012

**TORRUELLA**, **Circuit Judge**. Defendant-Appellant Joseph Acevedo-Maldonado ("Acevedo") was convicted after a jury trial of producing, and aiding and abetting in the production of, a visual depiction of a minor engaged in sexually explicit conduct using materials mailed, shipped, or transported in interstate or foreign commerce. 18 U.S.C. §§ 2251(a) & 2. Acevedo appeals, asserting that the Government's proof as to the crime's jurisdictional element -- i.e., that the materials were a part of foreign or interstate commerce -- rested on inadmissible hearsay which violated his right to confrontation under the Sixth Amendment. For the following reasons, we affirm Acevedo's conviction.

## I. Background

Facts are derived from testimony given at trial. As this appeal follows a conviction, "we recount the facts in the light most favorable to the verdict." United States v. Poulin, 631 F.3d 17, 18 (1st Cir. 2011).

On January 30, 2009, police officer Javier Rivera-Yambo ("Rivera") executed a search warrant for computer equipment at both Acevedo's apartment and the home of Acevedo's mother in Utuado, Puerto Rico. The search of Acevedo's apartment proved fruitless, but the inspection of his mother's house did not: officers uncovered a webcam that Acevedo admitted was his to investigating officers. Acevedo also stated during the search warrant's

execution that he had a computer at his sister's home.[1]  Based on this statement, officers proceeded to his sister's house.  Officers seized a "computer tower"[2] located "nearby [the sister's] residence."  Rivera testified that the seized tower appeared to be "broken down," as if someone had "tried to tear it apart."

On February 2, 2009, Wilmary Ramos Soto ("Soto"), a Task Force Agent in the Cyber Crimes Division of U.S. Immigration and Customs Enforcement ("ICE"), went to the Utuado Police Station to collect the evidence seized during the searches of Acevedo's residences.  Among the items that Soto collected at the station were the computer tower, the webcam, and other electronic devices.  Soto transported these items, including the hard drive, to a forensic inspector; the hard drive[3] was then sent to Drive Savers in the mainland United States.  True to its company name, Drive Savers specializes in retrieving lost information from damaged hard

---

[1]  Questioning at trial confirmed that prior to executing the search warrant, Acevedo was arrested for state charges unrelated to this case.  On being placed under arrest, officers administered Miranda warnings to Acevedo.  Acevedo volunteered his statement confirming ownership of the webcam, and informed officers as to his computer's location in response to non-coercive police questioning.

[2]  Both testimony and the parties' briefs refer to the seized computer equipment as a "computer tower."  A computer tower is a type of computer that is generally in a box-like, rectangular shape.  It holds many of the components of a desktop computer, including a hard drive, motherboard, and power supply.  We refer to this equipment interchangeably as a "computer" or "computer tower."

[3]  Testimony offered at trial by one of the computer equipment examiners defined a hard drive as "a combination electronic/ mechanical device that's used to store data."

drives for customers by repairing them and making duplicate copies of their salvaged information.

Ron Cen ("Cen"), a clean room[4] technician who has worked for nine years retrieving data from damaged hard drives at Drive Savers, was in charge of examining and rescuing any available data from Acevedo's hard drive and making an identical image copy[5] of the retrieved data. Cen was successful in his tasks; he restored Acevedo's hard drive and made a clone-image copy of the drive.

ICE also enlisted the assistance of Maine State Police Sergeant Glen Lang ("Lang"), a supervisor of that state's Computer Crimes Unit who had extensive experience working and training others in computer forensics, and who occasionally assisted in out-of-state cases. According to Lang's testimony, ICE sent him the 40-gigabyte[6] Samsung hard drive seized from Acevedo's home and the copy made by Drive Savers. He also made his own image copy of the drive seized by the police. Lang had instructions to examine the

---

[4]  Even though Cen did not explain during his testimony what a clean room is, we presume it refers to a special type of laboratory required to carry out the retrieval of data from damaged hard drives.

[5]  Cen explained that an image copy is, "a bit-by-bit clone of the drive that is made to a "clean targetwell[]," or new hard drive with purpose of producing "an identical copy of the data set" that the engineers can work on.

[6]  A gigabyte is a billion bytes. "Byte," in turn, means "a group of adjacent binary digits often shorter than a word that a computer processes as a unit," and the prefix "giga-" means "billion." Webster's New Collegiate Dictionary 192, 517 (9th ed. 1986).

-4-

data for any video clips it might contain. His inspection of the hard drive revealed a number of videos. Of those pertinent to this case were approximately five, which "all contained a small string of text . . . associated with the Logitech webcam" that Rivera seized during the search of Acevedo's mother's home. These videos "all involve[d] some activities at a residence, generally involving a girl and an adult male."

On July 9, 2009, a grand jury indicted Acevedo and his female partner, Jennisse López-Correa ("López") (collectively, the "defendants") of one count. The count charged that in April 2006, defendants employed, used, persuaded, induced, enticed, or coerced a female minor, identified as "L.G.,"[7] to engage in sexually explicit conduct with Acevedo for purposes of producing a visual depiction of the same, which was recorded on a webcam and computer that had been transported in interstate or foreign commerce. López pled guilty to the charge; she also agreed to testify against Acevedo at trial, which took place on July 7 and 8, 2010.

At trial, the Government presented several witnesses, including López and L.G. López identified the seized computer and webcam as the recording devices that she and Acevedo used to document Acevedo's sexual encounters with L.G. López also described her role in filming Acevedo's sexual encounters with L.G., and identified both of them in the videos -- obtained from

_____

[7] The initials, "L.G.," are used to protect the victim's identity.

the seized hard drive -- that were played for the jury.  L.G. likewise identified the seized webcam and computer as the devices with which Acevedo and López recorded Acevedo's sexual encounters with her, and identified herself and Acevedo in the videos shown to the jury.

The Government also presented the testimony of Cen and Lang to establish the jurisdictional element of the offense.  The prosecution tendered Lang as an expert in the area of computer forensics, especially retrieval and preservation of electronic evidence, without objection by Acevedo, who also declined an invitation to voir dire.  Cen and Lang each testified at trial concerning the origins of the hard drive and webcam, and their testimony served as the only evidence introduced at trial supporting the jurisdictional element of the Government's charge. Specifically, the Government asked Lang as to the hard drive's manufacturing location:

Q:    And where was this hard drive made?

LANG: [K]orea.

　　　****
Q:    And is that webcam compatible with the webcam you have described was used to create those videos?

LANG: Yes.

Q:    Now,    where    was    that    webcam
manufactured?

            ****

    LANG:    This webcam was made in China.

(Emphasis added.)

Cen, for his part, testified:

    Q:    Can you say the make of that [hard]
    drive, describe it?

    CEN:    It's a drive -- it's a Samsung 40-gig
    drive that it's, I believe -- the make -- was
    made in Korea.

            ****

    Q:    And what is the country of fabrication
    of this hard drive?

    CEN:    This is a Samsung drive that's made in
    [K]orea.    And it's a 40-gig -- 40 gigabyte
    capacity.

(Emphasis added.)

Acevedo did not object to the Government's submission into evidence of the hard drive or the webcam, nor did he object to Cen's or Lang's testimonies regarding the origins of the hard drive and the webcam at the time they were offered.  In fact, Acevedo's counsel did not cross-examine Cen at all and only cross-examined Lang to inquire if he could tell, from the data he analyzed, who created the videos and who accessed them after they were created. That is, Acevedo's counsel did not probe Lang as to the basis for his expert testimony regarding the origin of the hard drive and the webcam.

-7-

Instead, prior to closing arguments, Acevedo moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29.[8] Acevedo asserted that the Government had failed to prove each element of the charged offense beyond a reasonable doubt. In particular, he argued that the only evidence offered concerning the interstate commerce-element of the offense were the labels on the computer equipment and Cen's and Lang's testimonies, which Acevedo understood to be a <u>Crawford</u> violation.[9]

The district court denied Acevedo's Rule 29 motion, stating that "no <u>Crawford</u> objection [had been] made," that Lang was "an expert for purposes of what his testimony entailed and specifically he was an expert in . . . computer forensics," and that, based on Cen's and Lang's respective expertise "and the fact that they dealt with . . . [computer evidence] hundreds of times and ... testified as to where it was manufactured," there was sufficient evidence for the jury to consider and make a determination. After a recess, the district court amended its ruling denying the <u>Crawford</u> argument to add "that the nature of

---

[8]  Rule 29 provides: "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).

[9]  A careful review of the record reveals that the labels affixed to the computer components in question were not submitted into evidence as separate items. Rather, they were attached to the hard drive and webcam that were submitted. In fact, no one had mentioned the labels until Acevedo brought them up in his Rule 29 motion.

these [computer] labels is nontestimonial."  It found that the labels were "not made under circumstances [that] would reasonably lead a reasonable person to infer that the statements in those labels . . . would later be used at a trial for purposes of prosecuting [Acevedo]."  After closing arguments, the trial court once again addressed the Crawford issue and noted that, although Acevedo had not made a contemporaneous objection at the time of Cen's and Lang's testimonies, it would "for all purposes" consider Acevedo's "argument as though it had been made at the time when these witnesses testified or before that."

On July 8, 2010, a jury convicted Acevedo of the underlying charge, i.e., violating 18 U.S.C. §§ 2251(a) & 2.  He was sentenced to twenty-five years imprisonment (to be served concurrently with state sentences imposed in April and December of 2010) and a twenty-year term of supervised release.  Judgment was entered on March 2, 2011.  This timely appeal followed.

## II.  Discussion

Acevedo limits his arguments on appeal to contending that the Government's proof regarding the jurisdictional element of 18 U.S.C. §§ 2251(a) was comprised of testimony based on inadmissible hearsay. He argues that the testimonies of the Government's witnesses regarding the origin of the hard drive and the webcam constituted inadmissible hearsay because it relied on the statements contained in the labels affixed to the same.  Acevedo

-9-

posits that, by admitting the testimonies of the Government's witnesses, the trial court violated his Sixth Amendment rights as articulated in Crawford v. Washington, 541 U.S. 361 (2004).

As a threshold matter, Acevedo contends that de novo review is warranted because he made a Confrontation Clause argument during his Rule 29 motion.[10] However, the proper standard of review is plain error since Acevedo failed to contemporaneously object to the testimonies in question and he concedes as much in his brief. See United States v. Rodríguez, 525 F.3d 85, 95 (1st Cir. 2008) (plain error review applies where defendant failed to object on hearsay grounds); United States v. Luciano, 414 F.3d 174, 178 (1st Cir. 2005) (same for failure to raise Confrontation Clause objection). Even though, after closing arguments, the trial court revisited the Confrontation Clause argument posed by Acevedo, stating that it would "for all purposes" consider his "argument as though it had been made at the time when these witnesses testified or before that," the lack of a timely objection cannot be cured by a trial court's ruling to the contrary. In this Circuit, "the contemporaneous objection rule is, for the most part, strictly enforced," and "a belated objection does not cure the original default." United States v. Houlihan, 92 F.3d 1271, 1298 (1st Cir.

---

[10]  We note that Acevedo does not appeal the denial of his Rule 29 motion. He challenges his conviction instead.

1996)(internal citations omitted). Therefore, plain error review is proper.

To establish plain error, Acevedo must show "(1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" Johnson v. United States, 520 U.S. 461, 467 (1997) (quoting United States v. Olano, 507 U.S. 725, 732 (1993)). If he is able to satisfy all three elements, this court, in its discretion, may "notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" United States v. Borrero-Acevedo, 533 F.3d 11, 15 (1st Cir. 2008) (quoting Johnson v. United States, 520 U.S. 461, 467 (1997)). "[T]his inquiry is substantially similar to the standard we follow in harmless error analysis, with the added wrinkle that the petitioner, not the Government, bears the burden of persuasion with respect to prejudice." United States v. Rodríguez-Adorno, No. 11-1034, slip op. at 8 (1st Cir. Sept. 12, 2012) (quoting United States v. Vázquez-Rivera, 665 F.3d 351, 363 (1st Cir. 2011)) (additional citation omitted).

Now, in tackling Acevedo's claims, we note that he concedes in several portions of his brief that the witnesses in this case relied on their expertise when testifying about the origins of the computer components. He directly states, "[t]he other source of their testimony came from their years of experience with the make and model of the [equipment]." Acevedo goes even

further: "[a]ssuming that the computer label is a hearsay exception . . . , [Cen] and Lang provided testimony that <u>did not come from the information in the label, the source came from their 'expertise'</u> which allowed them to recognize the make and model and from there conclude that that type and model was manufactured [out-of-country] and therefore shipped in foreign commerce." (Emphasis added). This concession -- that the witnesses relied on their expertise to assess the equipment's possible passage through interstate commerce -- dooms Acevedo's hearsay claim. <u>See</u> <u>United States</u> v. <u>Martínez-Medina</u>, 279 F.3d 105, 125 (1st Cir. 2001) (finding that the concession regarding drug quantity made by a defendant in a brief before this court was "fatal to his claim of error").

Moreover, not only does Acevedo concede that Lang could have relied on his expert testimony, but it is also clear from the record that Lang's training and qualifications more than allowed him to testify as to the origin of computer components with which he had logged years of experience, and as to which he both conducted and trained others in forensic examinations of the same. A review of his testimony permits a reasonable inference that he relied only on his own expert judgment in concluding that the components had been made in Korea and China. In fact, his testimony states that he personally worked with the hard drive and the webcam in question during the investigation. His direct

-12-

contact with the objects and his expertise would have allowed him to form an opinion about their origin through a comparison of his observations with his prior experiences evaluating such equipment.

Given that we conclude that Lang could plausibly have relied on his own expert knowledge rather than the labels, we need not determine whether reliance on labels to establish the jurisdictional element of a crime would be permissible or whether the labels themselves are admissible or testimonial. Such is not the case before us, and we leave those difficult questions for a future challenge, adequately brought and preserved.

Evidently, the Government could have directly asked Lang about the basis for his opinion that the components were foreign-made. However, the absence of that foundation does not have, as Acevedo contends, the consequence of rendering his conviction reversible. Lang's uncontested expert testimony alone would have allowed the jury, after weighing it and giving it the credibility it deemed proper, to conclude that the Government had proven the jurisdictional element of the case beyond a reasonable doubt. We thus find no plain error.

### III. Conclusion

Based on the reasons discussed above, we affirm the judgment of the district court.

**Affirmed**.

-13-