# United States Court of Appeals
## For the First Circuit

No. 20-1660

UNITED STATES OF AMERICA,

Appellee,

v.

REGINALD ABRAHAM,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

Before

Kayatta, Lipez, and Howard,
Circuit Judges.

Leslie Feldman-Rumpler for appellant.

Mark T. Quinlivan, Assistant United States Attorney, with whom Nathaniel R. Mendell, United States Attorney, was on brief, for appellee.

March 24, 2023

**LIPEZ**, <u>Circuit Judge</u>. Reginald Abraham was convicted by a jury of four counts of sex trafficking. On appeal, Abraham claims that, when the district court asked the jurors a special question relevant to sentencing contemporaneously with their deliberations on his guilt, it improperly commented on the coercion element of the sex-trafficking offenses. Accordingly, Abraham argues, his conviction must be reversed. Applying plain error review to the claim of instructional error, we reject Abraham's contentions and affirm.

## I.

### A.  The Charges

Abraham was charged by a federal grand jury with six counts of sex trafficking in violation of 18 U.S.C. § 1591(a), (b)(1). The relevant provisions criminalize knowingly causing a person, or benefiting from a venture that causes a person, to engage in commercial sex acts through "force, threats of force, fraud, or coercion." In relevant part, "coercion" is defined as "threats of serious harm to or physical restraint against any person" or "any scheme, plan, or pattern intended to cause a person to believe that failure to perform an act would result in serious harm to or physical restraint against any person." 18 U.S.C. § 1591(e)(2)(A)-(B).

**B.  The Trial Evidence**

Ordinarily, in a challenge to a jury verdict and judgment, "we recount the essential facts of the case, drawn from the trial record, in the light most favorable to the verdict." United States v. Mubayyid, 658 F.3d 35, 41 (1st Cir. 2011). However, in the situation we have here, where an appellant does not challenge the sufficiency of the evidence to support his conviction, there is no clear consensus in our circuit whether to recite the facts in the light most favorable to the verdict or "to present the facts in a balanced way, without favoring either side." United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014). Because the briefing on appeal does not reveal any significant disagreement regarding the facts of the case, we present the facts in a "balanced fashion." United States v. Maldonado-Peña, 4 F.4th 1, 14 n.2 (1st Cir. 2021). Even related that way, the facts are difficult to recount.

Abraham usually began communicating online with the women he trafficked, convincing them he wanted to be their boyfriend and then luring them to a house from where he conducted his trafficking organization. He operated first out of a house in Malden, Massachusetts and later out of a house in Dracut, Massachusetts. He often secured business for the women by posting prostitution advertisements online. In structuring his trafficking organization, Abraham would appoint a woman, often a

- 3 -

sex worker herself, to serve as the "bottom" in the house. A "bottom" was responsible for tasks such as dressing the women for prostitution "dates," doling out drugs to the women after Abraham approved the amount, driving women to dates, posting advertisements about the women on Backpage.com, and informing Abraham when any of the women broke his rules.

The jury heard evidence at trial that Abraham had engaged in the sex trafficking of four young women from Maine -- J.N., K.G., T.B., and E.S.[1] -- by force, fraud, or coercion, from approximately January 2012 through at least August 2016. Abraham's criminal conduct toward each victim was the subject of separate counts.[2]

### 1. Count Two

J.N. testified that Abraham began communicating with her on Facebook sometime in 2015 while she was living with her mother in Maine. At the time, J.N. had just ended a six-year relationship and was, by her testimony, "[d]esperate," "lonely," and "just

---

[1] The victims are identified by their initials to protect their identities. See Ohio v. Clark, 576 U.S. 237, 240, n.1 (2015); United States v. Acevedo-Maldonado, 696 F.3d 150, 154 n.7 (1st Cir. 2012).

[2] Abraham was found not guilty on Count One, which alleged sex trafficking of a fifth woman. We therefore recount the testimony of only the four women named in the counts of conviction: Counts Two, Three, Five, and Six. Count Four was dismissed before trial upon motion by the government.

wanted help." She stated that Abraham convinced her to come visit him in Massachusetts by telling her she could work at a car dealership he owned or find work dancing at a strip club. Abraham drove to Maine to pick her up and brought her to his home in Dracut for the weekend. After the weekend, Abraham drove J.N. back to Maine but continued to communicate with her. She eventually moved into Abraham's Dracut residence, where other women that Abraham was coercing into sex work also lived.

At first, Abraham instructed J.N. to be one of the "bottoms" who would assist him in running his prostitution business. She gave drugs to the other women in the house and reported to Abraham if any of them broke his rules. J.N. testified that at some point Abraham forced her to engage in prostitution along with the other women. J.N. was called by men who had viewed advertisements on Backpage.com that had been posted by Abraham or another woman. J.N. met with the men at their homes or at hotels. She typically made $500 to $1,000 a night and gave Abraham all the money she earned, with the result that she had to ask him for money whenever she needed it.

If J.N. and the other women in the house broke his rules, Abraham beat them or withheld drugs from them to force them into withdrawal. J.N. testified that on one occasion, Abraham forced her into a dog cage in the basement because "[h]e was upset with me and I wasn't following his rules and he wanted to break me;" on

another occasion, he choked J.N. and hit her in the ribs; on yet another occasion, Abraham hit J.N.'s foot with a hammer when she slept too late. J.N. also saw Abraham violently beat other women who lived in the house, including one instance in which he beat a woman so badly that, as J.N. testified, "[s]he was bleeding everywhere, from her eye, from her nose, and you know, her head in a couple places, and, um, she was saying like she got hit a couple of times, so she was having stomach problems," and "she could barely walk." Abraham also showed J.N. and the other women in the house a news report about the death of a woman called "little Ashley" who had been stabbed and burned to death in her car, warning them, "[t]hat's what happens when you don't listen."

J.N. also explained that Abraham gave extra heroin to women who used that drug and who reached their prostitution "quota." She testified that Abraham got her addicted to drugs by giving her oxycodone pills that he claimed were Xanax pills. Abraham at times forced her into withdrawal by denying her drugs, which J.N. described as extremely painful, reporting, among other reactions, that "it feels like you're dying."

J.N. testified that, when she told Abraham she wanted to leave, he told the other women to leave the house, put out a cigarette on her face, and invited five or six friends over, who proceeded with Abraham to rape her multiple times. Abraham later told the other women in the house that they would receive the same

treatment if they tried to leave. J.N. nonetheless decided to leave, at which point Abraham put a gun to her head and said, "I'll kill you right here." When J.N. insisted she was leaving dead or alive, Abraham dropped her off at a hotel in Tewkesbury, Massachusetts. A few days later, J.N. went to a hospital to seek treatment for the burn on her face.

## 2. Count Three

K.G. testified that she first learned about Abraham in August 2015 from a woman named Corina when they were both residing in a detoxification facility. Corina told K.G. that Abraham was a pimp who provided her with drugs and other items, and K.G. and Abraham began communicating through Facebook and telephone calls. K.G. testified that, after she left the detoxification facility, Abraham came to her residence and brought her crack cocaine and rum. He asked her to come to his house to manage the women who were working for him as sex workers. K.G. initially declined, but eventually agreed to work for Abraham. Although Abraham had told K.G. that she would "manage the girls," she in fact began to engage in sex work for him. K.G. testified that she wanted to make more money for Abraham than the other women in order to obtain extra drugs.

K.G. testified that she and the other women had to follow Abraham's rules, including giving him all money they earned. If any of the women broke any of his rules, Abraham beat or choked

them and withheld drugs to force them into withdrawal. K.G. testified that Abraham "wanted us to always watch somebody else get beat so we could learn our lesson." She recalled one instance in which Abraham repeatedly beat a woman named Kayla so badly with a pair of spiked shoes that she was choking on her own blood. He continued to beat her even when she begged him to stop.

K.G. stated that Abraham not only made her watch his acts of violence against the other women, but he also beat K.G. and another woman after he discovered that they had smoked crack cocaine in his car. She testified that for about an hour "he choked us, punched us, um, dropped us on our backs after he lifted us up in the air."

### 3. Count Five

T.B. testified that she met Abraham in 2012 when she was living in Lewiston, Maine and selling marijuana. On two occasions, Abraham bought marijuana from her and, after exchanging messages, they began socializing. Abraham then invited her to visit him at his house in Malden. A few days after she arrived there, E.S. (the victim named in Count Six) and another woman came to the Malden residence, and Abraham told T.B. to "shadow" E.S. on prostitution "dates." T.B. eventually began working for Abraham as a sex worker. She turned over almost all the money she earned to Abraham. While T.B. worked for Abraham, she estimated there were anywhere from thirty to fifty other women working for him as

sex workers, most of whom he had met through Facebook. At some point, T.B. became the "bottom" at the Malden house. Abraham had T.B. co-sign a lease with him when he moved the operation to the house in Dracut.

T.B. testified that if a woman failed to make enough money or violated one of Abraham's rules, he punished them by reprimanding them, hitting them, or keeping drugs from them to force them into withdrawal. T.B. testified that Abraham beat her when she herself broke his rules, including once punching her repeatedly in the ribs when another man looked at her in a hardware store. She also described an occasion when Abraham pistol-whipped her, punched her in the face, and threatened to kill her after he saw a text from another man on her phone. He beat her until she was bloody and urinated on herself, after which he ordered her to sleep in a puddle of her blood and urine. T.B. further testified that Abraham intimidated and humiliated her in other ways -- for example, he once forced her to wear a spiked dog collar all day, including on "dates" with clients, because he said she was being "mouthy" and he also forced her to get down on all fours and drink from a dog bowl. T.B. stated that, to intimidate her and the other women, Abraham told her that he was a member of the violent Haitian street gang "Zoe Pound."

T.B. stated that she attempted to leave Abraham a few times, but he convinced her to return to act as a "bottom" in the house. T.B. left Abraham for good in 2015.

**4. Count Six**

E.S. testified that she met Abraham on Facebook in 2012, shortly after losing her stillborn son, and at a time when she was living in a homeless shelter in Maine. Abraham told her he was living a great life, and E.S. believed he wanted to be with her. Abraham drove to Maine to pick her up and brought her to his house in Malden. After one night, two or three other women arrived. When E.S. asked who they were, Abraham told her they were escorts and that he was a pimp.

E.S. testified that Abraham asked her to be a sex worker for him. E.S. did not feel that she could say no. She stated that she met the men who responded to the advertisements on Backpage.com at a hotel room or at their houses, giving all the money she received to Abraham. E.S. testified that she became addicted to Suboxone, and Abraham forced her to engage in commercial sex before he would give it to her. According to E.S., Abraham punished her and the other women if he thought they were not making enough money or if they broke the rules. At some point, E.S. became Abraham's "bottom" in the house for "a very short period of time."

E.S. also testified that Abraham told her that he belonged to a Haitian street gang that killed people for fun, and that he himself had "caught some bodies," all of which scared her. On one occasion when E.S. returned to Maine with T.B., Abraham convinced her to return by threatening to hurt her family and by telling her that things would be different. E.S. testified that, when she left the house for the last time in 2015, Abraham threatened to kill her and her family.

## C. Verdict and Sentence

The jury found Abraham guilty on Counts Two, Three, Five, and Six and, as noted above, found him not guilty on Count One. The court sentenced Abraham to concurrent terms of 262 months' imprisonment on the four counts of conviction and 15 years of supervised release.

## II.

## A. Trial Events at Issue on Appeal

During the trial, the judge told the parties that, consistent with his standard practice, he would ask the jury to find the facts relevant to any sentencing enhancement sought by the government. He explained that he would consider the jury's fact-finding but still make his own independent determination at sentencing. The government subsequently sought a leadership role enhancement under section 3B1.1 of the Federal Sentencing Guidelines, which required a determination that Abraham was an

"organizer or leader" of a criminal activity in which others participated.  See U.S.S.G. § 3B1.1.

The leadership-role question, which was included on the verdict form as Question Six, was presented as follows:

   6. Was Reginald Abraham the organizer or leader of others involved in sex trafficking?

   _____no

   _____yes, three or more

   _____yes, five or more

The court gave the following instruction on this question:

> I've asked you a question, Question Number 6. Now if your verdict is not guilty of Mr. Abraham . . . don't answer Question 6, just leave it blank.  Indeed if your verdict is not guilty as to [J.N.], the question right above, if your verdict is not guilty as to [J.N.], don't answer Number 6, and here's why.
>
> Number 6 affects . . . it guides me -- if you do find him guilty of sex-trafficking[] [J.N.], it may guide me in what sentence to impose, and so I have to know if this specific element has been proved and the question is this, "Was Reginald Abraham the organizer or leader of others involved in sex-trafficking?" Well if he wasn't, answer "No."
>
> **Now in answering this question you can consider all the . . . all the evidence you have but I will tell you . . . you can consider these -- if you believe the testimony about one or alternating ones being so-called**

- 12 -

**"bottoms," or the government's called them "madams," that's . . . -- in order to -- when I say was he the "organizer" or "leader," I'm talking about people who are actually allied with him and on this evidence you can't find beyond a reasonable doubt that the people who were named were allied with him in setting up the calls because of the evidence about that they were coerced and the like. I make no finding. I can't tell you what finding to make. I simply say you don't count the bottoms.**

You may consider the bottoms with respect to whether he was living off the proceeds of a prostitution call that he himself didn't set up because of the bottom, and I've already gone over that, but what I'm talking about here is the testimony from [J.N.] that others were called in to rape her. And if you believe that, if you believe that beyond a reasonable doubt, you may answer "Yes," and then I need to know was it three or more or was it five or more? But if you don't believe -- if you have any reasonable doubt about that, answer "No" as to that. But you never even consider Question 6 unless you find him guilty of sex-trafficking [J.N.].

(Emphasis added.)

Both parties objected to presenting the leadership-role question to the jury along with questions asking the jury to determine guilt or innocence on the charged crimes. Analogizing to death penalty proceedings, Abraham requested that the jury deliberations be bifurcated such that Question Six would be presented to the jurors only after they had reached verdicts on the five counts. His attorney first made this request before the jury was charged and the entirety of his argument was as follows:

- 13 -

> [I]t's occurred to me that reaching this question of punishment and enhancements or increases in offense level, adjustments to offense level . . . is very similar to putting to a jury whether or not to put the defendant to death, for instance, at a bifurcated proceeding. What I would hope your Honor might do is to allow the jury to first deliberate the question of guilt or innocence.[3]

The judge simply replied, "I've reflected on that. We're not going to do that. Your rights are saved." After the charge was given, Abraham again raised his request at sidebar:

> Defense Counsel: We would renew our request for bifurcation --
>
> Court: I know what you're talking about and your rights are saved.

The government, for its part, objected to putting the leadership-role enhancement to the jury at all, arguing that this was a question for the judge to decide by a preponderance of the evidence.

Defense counsel also requested that Question Six be revised to include language advising the jury to answer the

---

[3] It is important to clarify what defense counsel meant by bifurcation, as it differs substantially from bifurcation in the death penalty context. In a case in which the death penalty may be administered as a sentence, there are two entirely separate proceedings. In the first proceeding, a jury considers questions related to guilt. In the second proceeding, a jury considers whether the death penalty should apply. Abraham was not requesting two entirely separate proceedings. Rather, he asked that the jury in the same proceeding be presented with Question Six only after it had answered questions going to guilt. In this sense, jury deliberations would be bifurcated in the same proceeding.

question "if and only if [it found] the defendant guilty of Number 5 [the J.N. count]." The court rejected this request because it had already instructed the jury to answer Question Six only if it found Abraham guilty on the J.N. count.[4] When defense counsel objected at the sidebar after the jury was instructed, he said he was simply reiterating his earlier arguments -- i.e., renewing the request for bifurcation.[5] At no point did defense counsel object to the substance of the instruction on Question Six.

The jury answered Question Six affirmatively, finding that Abraham was the organizer or leader of three or more others involved in sex trafficking. The district court agreed with the jury's finding and applied a two-level enhancement based on Abraham having been an organizer or leader of fewer than five other participants.

---

[4] As explained later in this opinion, the district court viewed the leadership-role enhancement as applicable only to that one count.

[5] For the first time in his reply brief on appeal, Abraham argues that the sidebar exchange in which the court told counsel "your rights are saved" demonstrates that he "did not have an opportunity to fully state the basis for his objection" because the court "cut [counsel] off mid-sentence." However, to the extent he develops this argument at all, Abraham waived the argument by failing to raise it in his opening brief. See, e.g., United States v. Casey, 825 F.3d 1, 12 (1st Cir. 2016).

## A. Standard of Review

Abraham argues that the district court's instruction on the leadership-role enhancement prejudiced him on the question of guilt. In particular, he points to the court's statement that the jury could not find beyond a reasonable doubt that the bottoms were allied with him "because of the evidence . . . that they were coerced and the like." Abraham contends that he was prejudiced because "the jury was told that there was evidence it could not ignore on the element of the offense, to wit: coercion."

Abraham's argument on appeal contrasts sharply with the one he made at trial. Before the district court, Abraham simply asked that the jury be permitted to deliberate on his guilt before being asked to consider the facts related to the leadership-role enhancement. He now targets the coercion language used by the court, arguing that the court, in effect, told the jury that coercion -- an element of the sex-trafficking crimes -- had been established by the evidence.

Under the Federal Rules of Criminal Procedure, Abraham's failure to "inform the court of [his] specific objection and the grounds for the objection" means that we may review his challenge to the coercion content of the jury instruction only for plain error. Fed. R. Crim. P. 30(d); see also Fed. R. Crim. P. 52(b); United States v. Houston, 857 F.3d 427, 433 (1st Cir. 2017)

("Because [appellant] did not make this specific argument before the district court, . . . we review this argument for plain error."). We have stated that "the plain error hurdle, high in all events, nowhere looms larger than in the context of alleged instructional errors." United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001).

To show plain error, Abraham must demonstrate that the coercion language in the enhancement instruction was (1) "an error . . . (2) which was clear or obvious and which not only (3) affected [his] substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Pennue, 770 F.3d 985, 989 (1st Cir. 2014) (quoting United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001)). We need not address the first two prongs of the plain error analysis because, even assuming that the coercion language in the leadership-role instruction was a "clear or obvious" error, Abraham cannot satisfy the third prong of the inquiry. See, e.g., United States v. Rodríguez-Santos, 56 F.4th 206, 219 (1st Cir. 2022) (reasoning that even if we assumed the district court clearly erred, the defendant could not show that he was entitled to plain error relief because he was unable to demonstrate that the error affected his substantial rights).

To show that an error at his trial affected his substantial rights, an appellant must demonstrate prejudice --

i.e., that the error "affected the outcome of the district court proceedings." Ramirez-Burgos v. United States, 313 F.3d 23, 29 (1st Cir. 2002) (quoting United States v. Olano, 507 U.S. 725, 734 (1993)). This requirement "generally means that there must be a 'reasonable probability that, but for the error, the outcome of the proceeding would have been different.'" Greer v. United States, 141 S. Ct. 2090, 2096 (2021) (quoting Rosales-Mireles v. United States, 138 S. Ct. 1897, 1905 (2018)).

**B. Discussion**

There is no "reasonable probability" that the challenged coercion language affected the outcome of Abraham's trial. As described above, the evidence of coercion was overwhelming with respect to each of the four women who were the subject of the criminal counts on which Abraham was found guilty. All four victims provided harrowing testimony about Abraham's manipulating them into joining his sex trafficking ring and his use of coercive methods to keep them under his control, including causing their drug addiction, withholding drugs, physically attacking them, threatening them and their families with death, and forcing them to look at women whom he had raped or beaten. While the details varied as to each victim, the women's testimony, taken as a whole, presented an avalanche of evidence supporting the element of coercion and the findings of guilt on each count.

Moreover, the court's leadership-enhancement instruction was directed solely to Count Two, which involved Abraham's alleged trafficking of J.N., because the court viewed the enhancement to apply only to the leadership of individuals who voluntarily participated in the criminal activities.[6] The court thus excluded Abraham's control of the women themselves as relevant to the enhancement and focused instead on the rape of J.N. by Abraham and his friends. To be sure, the language that the court chose to describe the leadership-role question to the jury -- even in that limited way -- was not ideal. But the court explicitly told the jury that it was making no finding on coercion and that "I can't tell you what finding to make."

Indeed, from the outset of the instructions, the court made clear that "when I speak about the evidence, don't for a moment think that I think that anything has been proved or anything has not been proved, I have nothing to say about that. . . . [T]he jury are the only ones who can decide the case." When the court later instructed specifically on the element of coercion, it reiterated that the jury was the factfinder. It first explained that "'coercion' can be the exercise of direct force, but it could be the withholding of drugs, it could be providing drugs knowing their addictive quality so that you're in a position to withhold

---

[6] The government argued against that understanding of the enhancement. We need not delve into that debate here.

- 19 -

or regulate the supply of drugs."  The court then added that "coercion could be, <u>if you believe the evidence</u> -- <u>and it's entirely up to you</u>, that a person -- it's got to be a specific person you're considering, was forced to watch the beating of another in order to coerce them."  (Emphasis added.)  The court also made clear to the jurors that they must consider coercion with respect to each of the women individually: "[I]t's the same charge [sex-trafficking] but different people, you have to consider each one separately . . . ."[7]

In sum, given the overwhelming evidence of coercion and the district court's repeated caution that the jurors needed to make the factual finding on that element themselves, we cannot conclude that Abraham's substantial rights were affected by the district court's comment on coercion.  Thus, he has failed to establish plain error.

**IV.**

We offer a final comment on the trial court's routine practice of asking the jury sentencing-enhancement questions at the same time it asks questions addressed to the defendant's guilt

---

[7] The court instructed in full: "The second element is, um, what makes it sex-trafficking is that Mr. Abraham knew or recklessly regarded the fact that force, threats of force, fraud, coercion, or any combination of such means would be used to cause the particular person -- and there are five different people, it's the same charge but different people, you have to consider each one separately . . . ."

or innocence. Both parties objected to that practice here. This case illustrates why the practice is problematic. As noted, the instruction given to the jury on the enhancement could have been perceived by the jury as commentary by the judge on the evidence relevant to the coercion element of the charged crimes. Its inclusion in the jury instructions during the guilt phase of the trial needlessly complicated the trial proceedings and provoked this appeal challenging the court's instructions.

The potential for such complications will always exist if the court asks the jury to concurrently consider evidence on the elements of the charged crimes and evidence on the sentencing enhancements that the government will seek if there is a conviction. That potential justifies reconsideration by the court of its routine practice.

**Affirmed**.